## PLAINFIELD–UNION WATER CO. v. BOARD OF PUBLIC UTILITY COM'RS OF N. J.

District Court, D. New Jersey. April 17, 1928.

Frank Bergen, of Newark, N. J., for plaintiff,

John O. Bigelow, of Newark, N. J., for defendant.

BODINE, District Judge. The plaintiff, Plainfield-Union Water Company, a New Jersey corporation, was created September 21, 1906. It is a consolidation of a number of old water companies supplying Plainfield and neighboring towns with water:

The defendant is a rate-making body created under chapter 195 of the Laws of the state of New Jersey, approved April 21, 1911.

In 1890, when the Plainfield Water Supply Company and Union Water Company, the predecessors of plaintiff, began to construct their waterworks, the population of the territory serviced was 18,516. By the last census (1920), the population of the same territory was 65,688, and probably ex-

ceeds 85,000 at present, and is increasing at the rate of about 5 per cent. a year.

The increased cost of service is shown by the following table:

|  | 1913 2,000 lbs. | 1920 2,000 lbs. | 1925 2,000 lbs. | Increase in 1925 over 1913 |
|---|---|---|---|---|
| Cost of 4″ pipe | $26.25 | $78.30 | $57.35 | 118% |
| Cost of 6″ pipe | 25.25 | 74.30 | 53.35 | 111% |
| Cost of 8″ pipe | 25.25 | 74.30 | 53.35 | 111% |
| Cost of 10″ pipe | 25.25 | 74.30 | 53.35 | 111% |
| Cost of 12″ pipe | 25.25 | 72.30 | 53.35 | 111% |
| Cost of 16″ pipe | 25.25 | 72.30 | 52.85 | 109% |
| Cost of 20″ pipe | 24.75 | 71.30 | 52.85 | 113% |

The increase in wages paid by the company since 1913 ranges from 105 to 216 per cent.

|  | 1913 | 1920 | 1925 |
|---|---|---|---|
| Cost of Coal.... | $3.10 pr. gr. ton of 2,240 lbs. | $7.50 pr. net ton of 2,000 lbs. | $5.94 pr. net ton of 2,000 lbs. |

2,240 pounds of coal now cost $6.66 as against $3.10 in 1913, an increase of 115 per cent. Besides, since that year taxes have increased enormously. Nineteen and four-tenths per cent. of the company's gross receipts were paid out in taxes in 1924 and 1925.

Plaintiff obtains its supply of water from 16 wells, from 200 to 500 feet deep, at Netherwood, in the easterly part of the city of Plainfield, and obtains supplemental supplies from the Elizabethtown and Middlesex Water Companies. All of its sources of supply are taxed to the limit, and there is no other source from which an adequate supply of water fit for domestic use and manufacturing purposes can be obtained by plaintiff, except at the point where the Raritan and Mill-stone rivers join in Somerset county, about three miles southwest of the borough of Bound Brook, and the cost of obtaining a supply of water from that source would be approximately $5,000,000, estimated by the present cost of construction, in addition to the amount already expended on the work. $1,500,000 of this cost would be borne by the plaintiff, as found by this court in Middlesex Water Co. v. Public Utility Commissioners, 10 F.(2d) 519.

On the 19th of November, 1923, plaintiff filed a schedule of increased rates with defendant, based on an elaborate and accurate inventory of its property, and a valuation of $3,800,000, made by one of the most competent and reliable hydraulic engineers in the country. This valuation was less than the full value of the property, and was purpose-ly so made in the hope of obtaining prompt and favorable action on the schedules; the plaintiff reserving the right to claim the full value of its property when it deemed advisable. Nothing was included in the valuation for plaintiff's source of water supply; nothing for the value created by the advantageous and valuable consolidation agreement made in 1906; and nothing for the favorable location of plaintiff's property in 16 rapidly growing municipalities; and in the estimate of the value of its physical property the engineer, employed by the plaintiff, used prices less than those prevailing at the time. Moreover, plaintiff, filing its schedule of increased rates, claimed income of only 7½ per cent. per annum on the value of its property in order to avoid controversy, delay, and litigation, although 8 per cent. is considered necessary for utilities generally, and defendant itself had allowed a return of 8 per cent. to other water companies shortly before.

On November 19, 1923, the defendant suspended the schedule of increased rates, without inquiry, to ascertain whether it should have been suspended or not, and hearings ensued as to the value of plaintiff's property.

On May 22, 1924, defendant filed its report or decision and order following the hearings, and asserted therein that the property of plaintiff was worth $3,337.000 for rate-making purposes, and prescribed a schedule of rates which defendant declared would yield to plaintiff 7½ per cent. on that sum, if paid in full, and at the same time made an order requiring plaintiff to deduct 10 per cent. from all of its bills rendered, for alleged inadequacy of service, which, in fact, did not exist, and has not occurred since the date of said order.

By operating under such schedule of rates, which remained in force until the 1st day of July last, plaintiff was not able to earn more than 5.06 per cent. in 1924, and 5.04 per cent. in 1925, on the inadequate valuation of its property made by defendant, and is not able now, under the schedule of rates, to earn more than 3½ per cent. on the value of its property used and useful in business.

On June 10, 1926, the defendant ordered that the rates prescribed by the order of May 22, 1924, be charged by the plaintiff, without deduction of the discount charged for inadequate service.

On August 26, 1926, the defendant issued a supplemental order holding as follows:

"1. That the petition of the Plainfield-Union Water Company to amortize 1924 and

1925 deficits and rate case expenses, aggregating $205,961.63, by an increase in rates for a two-year period beginning with October, 1926, quarterly billing, be and the same is hereby dismissed.

"2. That the said Plainfield-Union Water Company be and is hereby authorized to recoup from rates an amount of $91,189, representing the deficits below a reasonable return during 1924 and 1925, by reason of the rates heretofore prescribed by this board and for the expenses of its 1924 rate case.

"3. That said amount of $91,189 may be amortized by a surcharge of 5 per cent. to be added to the existing schedule of all rates of the Plainfield-Union Water Company until such time as the excess revenue produced by such surcharge shall have equaled said sum of $91,189.

"4. That the said Plainfield-Union Water Company shall impose said surcharge on bills for water beginning with the quarter following July 1, 1926, and continue the same until such time as said amount of $91,189 shall have been amortized by excess revenue produced by said surcharge of 5 per cent. and no longer.

"5. That the said Plainfield-Union Water Company shall make quarterly reports with respect to the amount received by it from the said surcharge of 5 per cent. in the manner more particularly set forth in the decision on which this order is based.

"6. That no part of the $35,691 of rate case expenses provided for in said sum of $91,189 shall be charged to expenses, but shall be charged directly to the company's corporate surplus account."

Thereafter the plaintiff filed its bill, alleging that the order of May 22, 1924, even as modified by the order of June 10, 1926, and the order of August 22, 1926, worked and work a confiscation of the plaintiff's property, in that they are based on an inadequate valuation of the plaintiff's property and, under the existing schedule of rates, the plaintiff is unable to earn more than $3\frac{1}{2}$ per cent. of the value of its property used and useful in its business.

The master first found the value of the plant to be $4,400,000. A reading of his exhaustive report indicates that he not only properly considered the rules of law established by the Supreme Court, but properly applied those rules to the testimony adduced before him. The conclusions from the testimony are properly drawn, and we cannot take seriously the minute criticisms of this and that finding supported, in our judgment, not only by the evidence, but by the clear weight of evidence.

The next question determined by the master is that $7\frac{1}{2}$ per cent. is a fair return upon fair valuation. In the Middlesex Water Case, the special master found $7\frac{1}{2}$ per cent. to be a fair return. His finding was approved by this court. Seven and one-quarter per cent. was fixed by the Board of Public Utility Commissioners in the Middlesex Case. Obviously, $7\frac{1}{2}$ per cent. is but a reasonable return upon a utility investment. (D. C.) 10 F.(2d) 529. The revenue received by the plaintiff company under the order and schedules were as follows:

| | |
|---|---|
| 1924 | $132,237 |
| 1925 | 132,686 |
| 1926 | 173,806 |

Obviously, these returns were not adequate upon the valuation fixed either by the utility board or by the special master, and were confiscatory.

The exceptions filed by the defendant are general. However, some will be noted here. No. 7 is as follows:

"The master found a valuation of $4,400,000, although it appeared that the plaintiff had represented to the defendant as the value of its property on which its rates should be fixed as of January 1, 1924, the sum of $3,800,000, and that the cost or value of net additions to the plaintiff's plant since that date are much less than $600,000, and that the plaintiff has not since that date presented to the defendant as a rate base, any greater valuation."

The figures of valuation submitted by the plaintiff in 1924, were, as previously noted, only partial and for the particular purpose of securing some immediate relief. Obviously the relief was necessary as the cost of everything purchased by the plaintiff to perform its work had vastly increased in cost. Since the valuations were tentative, there is no estoppel which prevents the plaintiff from showing true value. The master's findings are supported by the clear weight of evidence.

Exception No. 8 is as follows:

"The master adopted a figure of $40 per ton as the basis for his calculation of the value of cast iron pipe constituting part of the plaintiff's property, whereas it appeared from the testimony that the value of cast iron pipe was not more than $33.10 per ton."

An examination of the record shows that there was testimony that cast iron pipe was worth $40 a ton. In fixing the value of cast iron pipe a single sale on a given day of an undisclosed quantity of pipe at $33.10 a ton is not conclusive upon the subject-matter. Certainly not where there is testimony from

several credible sources that the average cost during the given year was some $40 a ton.

The ninth exception is as follows:

"The master included in the rate base or valuation of the plaintiff's property, extensions constructed by funds amounting to approximately $115,000 advanced to the plaintiff by its customers for such extensions and still retained by the plaintiff."

The moneys which the defendant refer to in this exception are deposited when the plaintiff is importuned to extend mains before they can be operated at a profit, in order to assist in the development of a community. Such deposits are merely a guaranty fund, and are returned as soon as the main becomes a profitable operation. Certainly the water company is entitled to include, in its property account, mains constructed without deducting such funds, since as soon as the main becomes profitable these deposits must be returned to the depositor.

As to the tenth exception, it need only be noted that there was testimony that the going value of the property was nearly twice as great as the master found it to be.

There is testimony throughout to support the conclusions of the master, and his findings will be affirmed, and a decree may be entered accordingly, which shall carry the costs.