PUBLIC SERVICE COMMISSION OF INDIANA, ET AL.,
INDIANAPOLIS WATER COMPANY *v.* CITY OF
INDIANAPOLIS

[No. 29,266. Filed January 11, 1956.]

74

*Edwin K. Steers*, Attorney General, *J. D. Wright*, Deputy Attorney General, for appellants Public Service Commission and its members.

*Joseph J. Daniels, G. R. Redding, John L. Wooling*, and *Baker & Daniels*, of counsel, all of Indianapolis, for appellant Indianapolis Water Company.

*Palmer K. Ward*, Corporation Counsel, *George R. Jeffrey*, Special Counsel of Indianapolis, for appellee, City of Indianapolis.

ARTERBURN, J.—This is an appeal from an action brought by the appellee, City of Indianapolis, in the Superior Court of Marion County, to set aside and enjoin an enforcement of an order of appellant, Public Service Commission of Indiana. The history of this case is as follows:

The order of the Commission was the result of a proceeding originally commenced by the appellant, Indianapolis Water Company, on September 18, 1953, when it filed with the Commission its petition for the approval of a new rate schedule to be charged for service. The petition also asks for authority to change the rate on which its reserve for depreciation was computed. City of Indianapolis intervened in this original proceeding before the Commission. On March 18, 1954, after hearing, the Commission entered its order approving a new schedule of rates and fixing a new rate for depreciation.

The City thereupon commenced this action against the Commission in the Superior Court of Marion County, to vacate that order and enjoin the Commission. The Indianapolis Water Company intervened as a defendant therein. Trial was commenced on September 20, 1954. At the close of the hearing on the application for temporary injunction, the trial court found no necessity to enjoin the Commission at that time but ordered that the amount collected as the result of the new rate increase be held by the Company available for the final decision in the case.

Pursuant to the direction of the trial court the City perfected a statutory appeal from the Commission's order and the same was consolidated with the injunction action. The consolidated action was heard by the Superior Court of Marion County in banc on the merits. At the conclusion of the hearing, the court found that evidence presented was materially different from that which had been offered during the proceedings before the Commission, and directed that all such additional and new evidence presented to the court be transmitted to the Commission for its reconsideration, as provided in Acts 1929, ch. 169, §8, p. 530, being §54-436, Burns' 1951 Replacement.

The Commission, after reviewing the additional evidence which concerns solely the amount of return on the rate base used, affirmed its earlier determination of fair value and return, but found that the annual gross revenues under the new schedule of rates would be approximately $111,000 in excess of the amount required to produce the income to which the Commission found the Company was entitled. Accordingly, the Commission modified its order and directed the Water Company to file a schedule of rates designated to produce gross income in the amount estimated in the

original order and duly certified and reported its action to the Superior Court of Marion County.

Thereafter, on February 7, 1954, the Superior Court of Marion County reconsidered the order of the Commission and there being no additional evidence introduced, the trial court set aside the Commission's order, and rendered a decision in favor of the City, holding the modified order of the Commission to be unreasonable and unlawful. A judgment of the trial court was entered vacating the Commission's order, permanently enjoining the Commission from enforcing such order or any modification thereof, permanently enjoining the Commission from charging the rates fixed by such order, and requiring the Company to refund to the consumer the amount collected in excess of the rates existing at the time the application was originally made to the Commission for an increase.

Upon the resubmission of the Commission's modified order to the trial court, no additional evidence was introduced and the Commission moved that the pending action be dismissed on the ground that there was no showing that it was not supported by substantial evidence. The trial court denied this motion, and entered a special finding of fact consisting of thirty-four items with conclusions of law thereon, and rendered judgment against the Commission and Water Company and in favor of the City, as stated above. Motions for a new trial were filed by the parties against whom the findings and judgments were rendered. The assignment of errors is based upon the overruling of the motions for a new trial. The motion asserted that the decision of the trial court was not sustained by sufficient evidence and was contrary to law, and on the part of the Commission, that the court erred in overruling its motion to dismiss.

This is an action brought under the statutes by the City for the purpose of testing whether or not the Commission in fixing the rates and making the order in question kept within its jurisdiction, and conformed to the standards fixed by the statute.

The present case is brought by the appellee, under the following statutory provisions:

"Any person, firm, association, corporation, city, town or public utility adversely affected by any decision, ruling, order, determination, requirement or direction of the public service commission may commence an action in the circuit or superior court of any county in which that portion of the utility which is the subject-matter of the procedure before the public service commission operates or seeks to operate, against the commission to vacate or set aside or enjoin the enforcement of any such decision, ruling, order, determination, requirement or direction, on the ground that the same is insufficient, unreasonable, unlawful, or procured by fraud or other unlawful methods."

Acts 1929, ch. 169, §1, p. 530, being §54-429 Burns' 1951 Replacement.

"Any single municipality or any ten [10] consumers or any utility affected by a rate order may within thirty [30] days from the rendition thereof by the commission take an appeal de novo to the circuit court of the county in which the utility is located or the general term of the superior court of Marion County."

Acts 1913, ch. 76, §9, p. 167; 1933, ch. 190, §4, p. 928; 1947, ch. 307, §1, p. 1251, being §54-203 Burns' 1951 Replacement.

What, then, is the scope of the court's statutory review? In other words, may the court impose its own idea of what is "insufficient" or "unreasonable" in the place of that of the Commission?

The City makes the contention that this is "an appeal de novo" under the statute and the trial court

thereby has the opportunity to weigh the evidence and substitute its opinion for that of the Commission. We, as judges, are subjected to the same natural desires and to the same weaknesses that all men have to substitute our personal judgment for that of others, and we must guard against such inclinations. Where the legislature has created a fact-finding body of experts in another branch of the government, their decision or findings should not be lightly overridden and set aside because we, as judges, might reach a contrary opinion on the same evidence. So long as the experts act within the limits of the discretion given them by the statute, their decision is final. The question raised here was thoroughly reviewed and decided by Judge Treanor in the case of *N. Y., C. & St. L. R. R. Co.* v. *Singleton* (1935), 207 Ind. 449, 190 N. E. 761. (Cert. den. 296 U. S. 578, 56 S. Ct. 89, 80 L. Ed. 409.) This court declared that the expression "appeal de novo" as used in the act under which the City brings this action does not have the same meaning as used in cases of an appeal from the justice of peace to a circuit court. In the latter situation the case on appeal stands in the circuit court as if it had been originally commenced · in that court. No legal affect is given to the trial before the justice of peace. Just the opposite is true where an "appeal" is taken from the order of the Public Service Commission.

Acts 1941, ch. 101, §5, p. 255, being §54-112, Burns' 1951 Replacement, creating the Commission, provides:

"The commission created by this act [§§54-102, 54-109—54-120] shall in all controversial proceedings heard by it be an impartial fact-finding body and shall make its orders in such cases upon the facts impartially found by it. The commission shall in no such proceeding, during the hearing, act in

the role either of a proponent or opponent on any issue to be decided by it."

Acts 1913, ch. 76, §84, p. 167, being §54-439, Burns' 1951 Replacement, provides:

"The burden of proof shall be on the party adverse to such commission or seeking to set aside any determination, . . . or order of the commission complained of is unreasonable or unlawful, as the case may be."

Another statute that is pertinent hereto reads as follows:

"All rates, tolls, charges, schedules and joint rates fixed by the commission shall be in force and be prima facie lawful, and all regulations, practices and services prescribed by the commission shall be in force and shall be prima facie reasonable unless finally found otherwise in an action brought for that purpose pursuant to the provisions of sections seventy-eight to eighty-five."

Acts 1913, ch. 76, §77, p. 167, being §54-428, Burns' 1951 Replacement.

The appellee, City of Indianapolis, has the burden, in the case before us, of overcoming the prima facie reasonableness of the Commission's presumptive impartial finding and order, certified to the trial court below. It can overcome this burden only by demonstrating and showing to the trial court that the Commission's order is not sustained by *substantial evidence*. This rule regarding "substantial evidence" is one adopted by the Supreme Court of the United States in *Florida* v. *United States* (1934), 292 U. S. 1, 12, 54 Sup. Ct. 603, 78 L. Ed. 1077, where the court said:

". . . its (commission's) findings of fact supported by substantial evidence are not subject to

review. It is not the province of the court to substitute their judgment for that of the commission."

This court has recognized this doctrine repeatedly: *Public Service Commission* v. *Indiana Bell Telephone Co.* (1955), 235 Ind. 1, 130 N. E. 2d 467; *Pub. Serv. Comm.* v. *Ft. Wayne U. Ry. Co.* (1953), 232 Ind. 82, 111 N. E. 2d 719; *Pub. Serv. Commission* v. *City of LaPorte* (1935), 207 Ind. 462, 193 N. E. 668; *N. Y., C. & St. L. R. R. Co.* v. *Singleton, supra* (1935), 207 Ind. 449, 190 N. E. 761.

The "substantial evidence" rule, in statutory appeals of this kind, leaves the function of fact-finding and rate-making with the Commission, where it belongs, and does not attempt to make it a responsibility or duty of the court, where it does not belong.

In the first place, rate-making is a legislative, not a judicial function, and even if a statute attempted to lodge such power in a court it would be unconstitutional. Although we have a constitutional system of government in which the judiciary is said to be supreme in determining the jurisdiction and limits on the powers of the other branches of the government, as fixed by the constitution and laws, yet this supremacy does not extend to the point where we may substitute our judgment for, or control the discretionary action of the executive or legislative branches, so long as their action is within the sphere and jurisdiction fixed by the statutes and constitution. Were it otherwise, the courts would usurp, thereby, all discretionary action in the government and in effect would be directing and supervising all branches. That, of course, was not, and is not the rationale under which our constitution was formed. *Federal Radio Com.* v. *General Electric Co.* (1930), 281 U. S. 464, 74 L. Ed.

969, 50 Sup. Ct. 389; *Keller v. Potomac Electric Power Co.* (1923), 261 U. S. 428, 67 L. Ed. 731, 43 Sup. Ct. 445.

In *State ex rel. Public Service Com.* v. *Marion C. Ct.* (1951), 230 Ind. 277, 100 N. E. 2d 888, 103 N. E. 2d 214, both the majority and the dissenting opinions take the same unequivocal stand on this fundamental tenet. Judge Emmert, in dissenting (on the denial of a writ of prohibition), quotes and reviews the opinions of the United States Supreme Court carefully, and says if the trial courts have the power to fix rates they "will have little time for anything else, in view of the complicated questions of value and rates involved and the voluminous evidence proper in such hearings. Why have any Commission at all if this court is going to usurp its powers?" The "substantial evidence" rule is the only reasonable rule for avoiding such a Serbonian bog.

> "The Supreme Court has, indeed, rejected as unconstitutional some statutory provisions in which the legislature has sought to impose broader duties of review upon the courts. Such duties, in the court's view, would violate the constitutional provision for separation of the powers of government."

28 Ind. L. J. 1 at page 5.

Under a strictly judicial review to which we are limited here, in addition to determining whether or not the order of the Commission is supported by substantial evidence, there is another matter in which the court may always properly inquire, and that is the question whether or not the order is contrary to law. Is the order or finding the result of considering or failing to consider some factor or element which it is apparent improperly influenced the result or final determination? In other words, did the Commission stay within its jurisdiction and con-

form to the statutory standards and legal principles involved in producing its order? This is purely a legal question and a proper one for the courts to determine in any judicial review regardless of any statutory provision. These issues include questions of legality of the administrative procedure and violations of fixed legal principles as distinguished from questions of fact or expert judgment or discretion. In some jurisdictions the writ of certiorari performs this function. *Ballman* v. *Duffecy* (1952), 230 Ind. 220, 102 N. E. 2d 646; *Staten Island Edison Corp.* v. *Maltbie* (1947), 296 N. Y. 374, 73 N. E. 2d 705, 8 A. L. R. 2d 825; 73 C. J. S., Public Utilities, §65, p. 1173; 73 C. J. S., Public Administrative Bodies and Procedure, §168, p. 510; 10 Am. Jur., Certiorari, §10, p. 533.

It is established law in this state that there is an inherent right to appeal to the courts for relief against the violations of personal or property rights as a result of administrative action. The legislature may not absolutely deprive one of such relief or judicial review. However, where the statute provides for a procedure for such review or for a judicial remedy, it excludes any common law or equitable procedure to the extent such statutory provisions are adequate in protecting and preserving such substantive rights guaranteed by the constitution, the statutes or general principles of law. Such statutory procedure must be followed at least to the extent of the remedy available before resort is made to any common law or equitable remedy. *Ballman* v. *Duffecy, supra* (1952), 230 Ind. 220, 102 N. E. 2d 646; *Joseph E. Seagrams & Sons* v. *Board of Com'rs.* (1943), 220 Ind. 604, 45 N. E. 2d 491; *State ex rel. White* v. *Hilgemann, Judge* (1941), 218 Ind. 572, 34 N. E. 2d 129; *Warren* v. *Indiana Telephone Co.* (1940), 217 Ind. 93, 26 N. E. 2d 399.

Judge Shake, in a case reviewing a decision of the Industrial Board, said:

"Strictly speaking, there is no such thing as an appeal from an administrative agency. It is correct to say that the orders of an administrative body are subject to judicial review; and that they must be so to meet the requirements of due process. Such review is necessary to the end that there may be an adjudication by a court of competent jurisdiction that the agency has acted within the scope of its powers; that substantial evidence supports the factual conclusions; and that its determination comports with the law applicable to the facts found." *Warren* v. *Indiana Telephone Co., supra* (1940), 217 Ind. 93, 105, 26 N. E. 2d 399.

To summarize what has been said:

(1) We are not concerned here with the general equity jurisdiction of the court in which it may weigh the evidence in determining the fact as to any issue of confiscation of property.

(2) The trial court has no power to hear the statutory "appeal de novo" in the common law sense and weigh the evidence or arrive at its own independent opinion or judgment.

(3) For the trial court to stay within its constitutional jurisdiction and not infringe upon another branch of the government, the judicial review of the order of the Public Service Commission in this case is limited to:

(a) A determination of whether or not the order or finding of the Commission is unreasonable in the sense that it is not supported by substantial evidence.

(b) A determination of whether or not the order of the Commission is unreasonable or unlawful in the sense that it is contrary to law because of a violation of certain legal principles or statutory requirements or the consideration of or failure to con-

sider certain factors or elements which it is apparent improperly influenced the result or final order.

The words "insufficient, unreasonable and unlawful" or terminology of like import, in the statute fixing the grounds of review, in this case, have only the ██ limited content or meaning specified above. This is necessary in order to give such statute granting a judicial review constitutional life. Where the statutory terminology of "reasonable' or "unreasonable" is used in this opinion it is in the limited sense referred to above. It might be said with some logic that any violation of a constitutional guaranty, particularly where the issue of confiscation is raised, could properly be classified also as unreasonable. However, since that issue is not raised here we see no reason for deciding such a question in this case.[1] *Public Service Comm.* v. *Indianapolis Rys.* (1948), 225 Ind. 656, 76 N. E. 2d 841; *Public Serv. Com.* v. *Ft. Wayne U. Ry. Co., supra* (1953), 232 Ind. 82, 111 N. E. 2d 719; 73 C. J. S., Public Utilities, §66(d), p. 1186.

---

1. It might be urged with some realism on the side of the consumer that "unreasonableness" of an order or rate means also one that is confiscatory as to the rate payer who is forced to pay a rate which is excessive, extortionate or beyond the value of the services rendered. Under our present urban social order the consumer has no choice but to pay to get water. He cannot dig his own well. Thus, extortionate or excessive rates might seem confiscatory as to the rate payer. Likewise, the rate if too low is confiscatory as to the utility, because the law compels it to serve all without discrimination. Under such rationale the Commission is bound at the extremes on each side (the rate payer and the utility) by constitutional safeguards against confiscation, thus giving each the same standards and safeguards.

*Terre Haute Gas Corporation* v. *Johnson* (1943), 221 Ind. 499, 45 N. E. 2d 484; 73 C. J. S., Public Utilities, §30, p. 1051; 16 C. J. S., Constitutional Law, §602, p. 1202; 43 Am. Jur., Public Utilities and Services, §67, p. 615.

The case of *Public Service Commission* v. *Indiana Bell Telephone Company, supra* (1955), 235 Ind. 1, 130 N. E. 2d 467, recently decided by this court, should be distinguished by reason of the fact that it was concerned with the constitutional question of confiscatory rates. In deciding that issue, the trial court, although conforming to certain statutory procedure, was acting under its general equity jurisdiction and was entitled to arrive at its independent judgment on the evidence presented, in determining the issue of confiscation of property, as in any ordinary suit in equity where an issue of fact is presented. In this case the order of the Commission may not be set aside if the finding or order of the Commission is supported by substantial evidence, regardless of whether or not the finding of the trial court is supported by evidence.

In such a case the finding of the Commission must prevail since its finding is made prima facie correct by the statute when the evidence is in conflict. The Commission is given this function by the statute as a legislative act and the court has no right to substitute its different opinion based upon conflicting evidence. For the court to do so would be in violation of the constitutional provisions for the separation of the powers of government.

On the other hand, the order of the Commission should be set aside if it is not supported by substantial evidence, or if it is found to be contrary to law in the sense used in this opinion. If any statute, any legal principle, or rule of substantive or procedural law has been violated in the composition of the final order, it cannot stand.

We have examined the forty-four special findings of fact of the trial court which formed the basis of the judgment setting aside the Commission's order. The

findings of the trial court and the contentions of the City in support thereof may be grouped and summarized as follows:

(1)  That the Company received too great a rate increase in 1951.  (Findings 5 to 10, both inclusive.)

(2)  The Company has retained earnings which were excessive over and above dividends and this is evidence that the rates are unreasonable and unjust. (Findings 12-17, both inclusive, and No. 34.)

(3)  The Company should have issued additional capital stock and bonds for expansion rather than retain earnings for that purpose.  (Findings 20-24, both inclusive.)

(4)  The valuation of used and useful property ($36,500,000) is unreasonable.  (Findings 28 and 29.)

(a)  Real estate valuation is improper.  (Finding 30.)

(b)  Customers' deposit and advancement for construction included in valuation improper.  (Findings 31, 32 and 33.)

(5)  The income and the rates are unreasonable, unjust and unlawful (Findings 11 and 24-26, both inclusive), and the rate of return is excessive.

We shall discuss the first three above features of the findings together, since they are related.

A great amount of time and effort is expended by the City in attacking a former order of the Commission made in 1951 fixing the rates at that time, and attempting to demonstrate that such rates were unreasonable and exorbitant.  The rates fixed in the 1951 order have been adjudicated and the court at this late date has no power or jurisdiction to go back and re-examine such an order.  Assuming the Commission had erred in 1951 and granted excessive rates,

of which there is no showing, there would not be the slightest justification for the Public Service Commission granting the Company, any rate other than that which would produce a reasonable return upon the *present fair value* of its used and useful property. The theory propounded by the City cuts both ways. If its contention were true, then a rate established in 1951 which was insufficient or caused a loss to the Company, would entitle the Company at this time to have a rate established by which it could recoup such a loss or deficiency.

Past losses of a utility cannot be recovered from consumers nor can consumers claim a return of profits and earnings which may appear excessive.

73 C. J. S., Public Utilities, §25(d), p. 1045; 43 Am. Jur., Public Utilities and Services, §§162, 163, p. 678.

The chances of a loss or profit from operations is one of the risks a business enterprise must take. The Company must bear the loss and is entitled to the gain depending upon the efficiency of its management and the economic uncertainties of the future after a rate is fixed. Were it not so, a premium would be placed upon inefficiency, waste and negligence in management. It is better policy to encourage thriftiness, saving and frugality on the part of a utility management. Such incentive inures eventually to the benefit of the consumers in succeeding rate hearings.

The City makes the further statement (referring to earnings retained by the Water Company and not paid out in dividends), "this clearly indicates either an inflated rate base or unreasonably high and unjust rates and charges permitting an exorbitant and unlawful return to the Water Company or both." Dr. Thatcher, the public's witness on the side which the appellee, City, now defends stated, "I am not suggesting that there

has been excessive earnings by the Company, especially in the latter years." This testimony is uncontradicted.

The City argues that the earnings of the utility retained by it over and above what it pays out in dividends is some sort of trust fund for the benefit of the consumers, and in some vague way does not belong to the Water Company. These unorthodox contentions are made in the face of the fact that the financial expert, a witness for the public, stated, in fact, that the dividend rate of the Water Company was too low. Nevertheless, a further claim is made that the Company had excessive earnings which it wrongfully used for additional capital expansion and which should have been used to pay dividends on an increased capital stock issue; that the money received from the capital stock issue should have been used for capital expansion along with a bond issue, the interest on which could also have been paid out of the alleged "excessive earnings." This contention is nothing more than declaring that the dividend rate of the utility upon its outstanding capital stock, is a criterion, by which one may determine whether or not the income, returns and earnings of the Company, is exorbitant and unreasonable. Of course, it should be understood that the total net earnings of a utility based upon a fair valuation of its useful assets is an entirely different standard and principle.

To say that a utility's rates are unreasonable because its pays large dividends or has a high per share earning rate, is a popular fallacy that seems to appeal to the public fancy. Such a statement is not that of which sound reasoning is made. It is only evidence of superficial thinking. The statute does not permit the Commission to fix rates based on the outstanding stock issue. The capitalization and the

stock outstanding may not have any fair relationship to the actual invested property used by the utility, or its reproduction cost, or its fair value.

If capital stock could be kept in the same relationship to the "fair value" of the assets used in the utility at all times, by issuing new stock, or by the reduction of outstanding stock, the dividends or earnings on the outstanding stock might reflect the reasonableness or unreasonableness of the return. However, such a supposition is unrealistic in view of the continued changing values and costs in every day operations. Indeed, every day and every minute there is a change in the values in the utility or in any corporation for that matter. It would be impossible to keep the outstanding stock in any exact relationship with the assets. Some companies from past practices may have a watered or excessive issue of stock. Other companies, by conservative and efficient practices, may have an under issue of stock outstanding and have surplus accumulated and left in the Company by reason of unusually low dividend rates, which surplus may not be represented by any outstanding stock. Stockholders may see fit to leave their earnings in the corporation instead of drawing them out as dividends and thus build up the financial strength and prestige of the Company. As a result, a utility is able to borrow at cheaper rates. This ultimately benefits the rate payer as well as the Company. The latter situation seems to prevail here according to the testimony of all witnesses on the subject matter, including the financial expert testifying on the side of the City. The record shows the common stock has earned $1.87 per share and paid out as dividends only 80 cents and 50 cents per share on Class A and B, respectively. Earnings left in a business is the least expensive method of acquiring new capital.

Such retained earnings belong to the corporation and the shareholders, and they are entitled to receive a return on such increased investment.

The unsoundness of the contention of the City that where either dividends or earnings on stock appear large per share, it is indicative that the rates charged are unreasonable, is self-evident. The appellee, City, would probably be, and should be, the first to object to a rate base measured by the outstanding stock of the utility.

The appellee, City, makes further complaint and the trial court's finding was, that the Water Company should have issued an additional $9,000,000 in preferred stock at 5% or $9,000,000 in bonds at 3% for the purpose of expansion. No issue of the kind was raised before the Public Service Commission, and it made no such findings or order at any time that such financing take place. The Company is not permitted under the law, to engage in such reorganization of its capitalization and such financing without a hearing and an order permitting such operation by the Public Service Commission. (§54-505, Burns 1951 Replacement.) If the City or consumers felt that this should have been done, they should have petitioned the Public Service Commission for an order compelling the Company to engage in this financing and expand its service specifically as directed in the order. The Company cannot be charged in a rate hearing for failing to engage in a large scale financial operation that has never taken place and was never in issue by any pleadings and on which no specific order was ever made. The statute does not permit the fixing of rates on a hypothesis or a situation never in existence.

Chief Justice Bobbitt, said recently in *Public Service*

*Commission* v. *Indiana Bell Telephone Company, supra* (1955), 235 Ind. 1, 130 N. E. 2d 467, 480.

> "Appellants (commission) could not arbitrarily disallow federal taxes which appellee had paid or was obligated to pay by assuming a tax saving under a capital structure which did not exist. This action was both arbitrary and unlawful."

The findings of the court, therefore, with reference to the rate of dividend paid, earnings retained, or the failure to perform other financial operations of the Company has nothing to do with the fair rate of return in this case nor the fair valuation of the property of the Water Company used in its utility service.

We next consider the findings of the trial court with reference to the valuation fixed by the Commission.

Finding 30 of the trial court states that the appraised value of the Company's real estate, exclusive of improvements, was fixed at $4,908,568 and it further finds that the maximum value could be only that assessed for taxation, which was $1,872,480. In the amended order of the Commission it is made clear that the Commission used the figure of $2,170,684 for its valuation which was the original cost figure of the land. There is a comparatively small difference between the total fair value figure used by the Commission and the taxation figure. Regardless of this, however, the finding of the trial court is contrary to law, in that it attempts to use for rate-making purposes a value for land fixed for tax purposes, which, by statute, is one-third of its market or sale value in 1949. The Acts of 1949, Ch. 225, §5, p. 724, being §64-1019n, provides:

> "The rate of assessment on lands shall not exceed thirty-three and one-third per cent of the market or sale value as of March 1, 1949."

No legislature may enact a law providing for a valuation of utility property for rate-making purposes at other than its full fair value. The provisions of §54-203, Burns' 1951 Replacement with respect to any requirement based on the Acts of 1949 are no longer effective or applicable. To construe it otherwise would result in its unconstitutionality. 43 Am. Jur., Public Utilities and Services, §120, p. 656; *Knott* v. *Chicago, B. & Q. R. Co.* (1913), 230 U. S. 474, 57 L. Ed. 1571, 33 S. Ct. 975.

The findings 31, 32 and 33 of the trial court are also contrary to law and not supported by the evidence. In these findings the trial court states that the ▉ customers' meter deposits and customers' advances for construction "has been included in all estimates of value before the Commission and by the Commission itself in arriving at its findings of fair value." These are not items included in the total which compose the figure fixed for the fair value of the utility's property. These deposits constitute an obligation which the Company owes to its customers the same as any other indebtedness, bonded or otherwise. It is not a deductible item any more than bonded indebtedness is a deductible item. The legal principle involved is well settled. *Vincennes Water Supply Company* v. *Public Service Commission* (7th Cir. 1929), 34 F. 2d 5; *Plainfield Union Water Co.* v. *Board of Public Utilities Comm.* (3rd Cir. 1929), 30 F. 2d 846, affirmed, 30 F. 2d 859.

Under findings 28 and 29 the trial court stated the fair valuation fixed by the Public Service Commission for the used and useful property of the Water Company, as a rate base was unreasonable. The standards to be used for the determination of the value is stated in the statute.

Section 54-203, Burns' 1951 Replacement, *supra,* in part, provides:

"The commission shall value all property of every public utility actually used and useful for the convenience of the public at its fair value, giving such consideration as it deems appropriate in each case to all bases of valuation which may be presented or which the commission is authorized to consider by the following provisions of this section. As one of the elements in such valuation the commission shall give weight to the reasonable cost of bringing the property to its then state of efficiency. . . . No account shall be taken of good will for presumptive values growing out of the operation of any utility as a going concern. . . . As an element in determining value the commission may also take into account reproduction costs at current prices, less depreciation, . . ."

The Commission has fixed a valuation of $36,500,000 as a fair value. The estimated original cost of the physical plant depreciated on September 30, 1953, was $33,565,000 and prior to the close of the hearing had been, by actual additions, increased to $36,700,000, to which should be added supplies and materials amounting to $410,000, and cash for working capital. It will be seen that this undisputed original cost figure exceeds the sum of $36,500,000 fixed by the Commission.

The figures on the fair valuation of the property of the Company on September 30, 1953, by the Water Company was $47,500,000. The public's witness on the same matter testified to a figure of $32,400,000 as the fair value of the physical plant only, on the same date, to which would have to be added more than $3,280,000 as the actual increase made to the utility plant from September 30, 1953, to the date of trial with an additional sum for cash working capital. This would bring the minimum figure by the public's witnesses for the

fair valuation and for the original cost depreciated at the time of the trial court's finding (October, 1954) to an amount in excess of that fixed by the Public Service Commission of $36,500,000.

The "fair value" testimony of the various witnesses is nothing more than their conclusions on an ultimate issue which is the duty of the Public Service Commission to determine from all the evidence presented. "Fair value" is a conclusion or final figure, drawn from all the various "values" or factors to be weighed in accordance with the statute by the Commission.

The fair value fixed by the Commission is below the reproduction cost less depreciation figures of $64,500,000 and $47,100,000 presented by the Water Company and public's witnesses, respectively.

In this connection, the City contends that the Commission should not take into consideration the cost of reproduction less depreciation; that this measure of value has been eliminated by the Supreme Court of the United States in *Federal Power Com.* v. *Hope Nat. Gas Company* (1944), 320 U. S. 591, 64 Sup. Ct. 281, 88 L. Ed. 33. An examination of that case shows that it held that reproduction costs less depreciation is not the sole or controlling criterion by which a rate base is established but that other factors may be considered, including original cost. This latter item, considered in the light of established facts and surrounding conditions, may be more controlling with the Commission who are experts in that field rather than the court. The case in effect says that the courts will not limit the Commission to any one or more methods of valuation, be it prudent investment, original cost, present value, or cost of reproduction. This court has held that cost of reproduction depreciated, is a

proper item to be considered under the statute in arriving at a fair value figure. *Public Service Comm.* v. *Indianapolis Rys., supra* (1948), 225 Ind. 656, 76 N. E. 2d 841.

The rate-making process involves a balancing of all of these factors and probably others; a balancing of the owner's or investor's interest with the consumer's interest. On the one side, the rates may not be so low as to confiscate the investor's interest or property; on the other side the rates may not be so high as to injure the consumer by charging an exorbitant price for service and at the same time giving the utility owner an unreasonable or excessive profit. Regardless of the weight to be given the factor of reproduction cost, it seems the figure for fair valuation fixed by the Commission could be sustained alone upon the evidence of original cost depreciated. Of this the City cannot complain, since it is the lower figure. *St. Joseph Stockyards Co.* v. *United States* (1936), 298 U. S. 38, 56 Sup. Ct. 720, 80 L. Ed. 1033; *Ohio Valley Water Co.* v. *Ben Avon Borough* (1920), 253 U. S. 287, 40 Sup. Ct. 527, 64 L. Ed. 908; 48 Colum. L. Rev. 1.

The trial court's findings Nos. 28 and 29 that the fair valuation of the used and useful property of the Water Company fixed by the Commission at $36,500,000 is unreasonable, and excessive is not supported by any evidence; on the other hand, the Commission's finding is based on substantial evidence.

We come now to a consideration of the trial court's finding and the City's claim that the rate of return is unreasonable. The testimony and briefs all refer to "gross" income or return, as the revenue remaining after subtracting all expenses of operation and other deductible items except the interest or debt cost. This seems to us a misnomer and in order to be more concise

we shall, where necessary, refer to this figure as "net" income or return.

The City relies heavily in its brief, upon the testimony of the public's witness, Dr. Thatcher, on the question of adequacy of the net return on the fair valuation figure. In fact, he was the only witness to testify on the public's or City's side of the case on that matter. We shall, therefore, accept his testimony as the most favorable in examining the trial court's finding in that respect.

Dr. Thatcher approaches the problem of a reasonable return by using the capital structure of the Water Company on December 31, 1952, as a base for his calculations, rather than a fair value figure of the assets used and useful as provided by the statute. The result is that his capitalization figure is nothing more than a book value of the property of the Water Company. It could be relevant on only two theories:

1. For the purpose of determining what income should be received by the utility in order that the financial strength of the Company be maintained, such that its securities would be attractive to investors, and thus give it the opportunity to develop and expand as the needs of the community require; in other words, to find the reasonable cost of capital.

2. As a rate base, upon which to figure a return, but only on the assumption that it represents the original cost depreciated, and then only on the further assumption that the accounting practice has been accurate.

The first ground is incidental here compared with the second, which is a major issue directly involved in this case.

The capitalization he uses is $33,978,300 taken from the statement of the Company on December 30, 1952.

This is composed of the stock equity (common, preferred and surplus accounts) plus the debt. He reaches the determination of a reasonable return by estimating what he believes to be a fair average overall cost of the capital. He finds the present actual cost (dividends and interest) to be 3.31% for the Water Company, and says:

"The overall rate of 3.31% is the result in a large part of the low dividend paid on common stock. . . . The 3.31% cash cost of capital may be considered the bare bone cost and should not be confused with my estimated capital or rate of return. In order to carry on a business successfully and attract capital necessary to finance needed additions, a utility must have earnings in excess of bare interest cost and low dividend requirements."

He states the overall cost of capital of the Water Company should be increased to 5.13% for a reasonable return. He said that additionally, there should be sufficient earnings to create a reasonable surplus to take care of the risk involved in the investment and unforeseen contingencies. Under his recommendation the owners would receive five to six per cent upon their equity. He condemns the present low dividend payout rate of the Water Company which has averaged approximately 30% of the earnings on Class B common and less than 45% of the earnings on Class A common, during recent years. He recommended that there should be a 70% dividend payout ratio. The public's witness finally recommended that the capitalization as of September 30, 1953, in the amount of $34,436,900 used as a rate basis should yield a return of 5½% in the amount of $1,894,030 as a net return. This is the minimum figure as shown in all the evidence as to the return to which the Water Company would be entitled

and is based purely on the book or original cost value depreciated.

Mr. Frank J. Travers, testifying for the Water Company, stated that $3,000,000 should be added to the capitalization figure of Professor Thatcher because of additional bank credit increase and additions to the plant in that amount since September 30, 1953 (the date of Professor Thatcher's figures). With a figure of $37,337,037 he stated that the average cost of maintaining the Company's financial standing would be 6.09% resulting in a net income of $2,426,907. His calculations included 3¾% for the debt, 5% for the preferred stock and 11% for the common equity money. It is undisputed that the capitalization figure Dr. Thatcher used in the amount of $34,-436,900 on September 30, 1953, had increased materially ($3,280,000) as shown by the Company's statement at the time of the trial in the lower court. At that time it exceeded the valuation of $36,500,000 fixed by the Commission. It would, therefore, appear, using the figures of the City's witness (increased by the time of the trial), with a 5½% return as recommended by the same witness, that the return should be $2,074,000 instead of $1,894,030 since the latter figure was not based on the addition to the Water Company investment which occurred during the subsequent year of 1954. The highest figure recommended as a return in the evidence was $2,426,907. The Commission found the net income on the rates fixed would approximate $2,070,000 to $2,140,000 before it modified its order reducing the gross return in the amount of $111,000. The final figure is between the highest and lowest figure, resulting from the testimony. In fact, it is slightly below a median and is supported by substantial evidence. The actual experience under the proposed rate

during the draught period in the summer of 1954 showed the rates would produce an income of approximately $2,037,994 on an annual basis instead of the highest estimate of the Commission. On this basis this income would produce a return of very close to, if not, 5½% on the value of $36,500,000. The public's witness testifying on the side of the appellee, City, stated in this connection: "I believe that 5.5% is a very reasonable rate of return and that that amount of earnings would maintain the financial integrity of the company. . . ." This is the lowest rate of return recommended by any witnesses before the Commission or trial court. The highest rate of return upon which there was any testimony was 6½% upon the valuation. There not only is substantial evidence to support the Commission's finding of a reasonable return, but it is not contradicted by any evidence presented by the City's side of the issue.

Finally, finding No. 11 of the trial court says in substance that the present 1954 order grants an increase in rates over the 1951 order from 25 to 37.5%. Evidence before the Commission (and also the trial court) upon which it acted showed among other things during this same interval the Water Company had a payroll cost increase of 25%; taxes increase of 80%; other general operating costs increase of 31%. The evidence further shows that since the valuation fixed in the 1951 order of $30,500,000, there has been added $8,491,498 in further expansion by the Water Company bringing the total valuation to a figure of $39,000,000.

From the examination of the testimony and evidence it is quite apparent that there is no evidence to support the finding of the trial court that the order of the Commission granted the Water Company excessive

earnings; on the other hand, substantial evidence supports the final order and findings of the Commission.

We have gone into considerable detail with reference to evidence presented before the Commission and trial court, mainly because of the rather unorthodox findings of the trial court and the contentions of the City. Such examination and investigation of the evidence, it should be understood, was not done for the purpose of weighing it, or substituting our opinion for that of either the trial court or Commission. This was done purely for the purpose of determining if the finding of the Commission was supported by substantial evidence. That it is so supported, is amply demonstrated. The Commission has performed its legislative function within its proper sphere. It has not stepped outside the statutory or constitutional limitations placed upon it. The Public Service Commission then should be permitted to determine the facts as provided by the legislature.

The judgment and orders thereunder, of the trial court, is reversed and this cause is remanded for such proceedings as are consistent with this opinion.

Bobbitt, C. J., concurs; Achor, J., concurs with separate opinion; Emmert, J., concurs with separate opinion; Landis, J., concurs in result.

CONCURRING OPINION

EMMERT, J.—I concur in the result of the majority opinion, but not in all the reasoning by which it was accomplished. In an appeal from an order of the Commission fixing utility rates, we ought not have one standard for the trial court to consider the evidence when the utility takes the appeal, and another standard when a customer of the utility takes the appeal. Equal

justice under law should give the same protection to the rate payer that it does the rate collector, and such a double standard for judicial review of rates cannot adequately protect the users of the utilities' services.

In *Public Service Commission of Indiana, et al.* v. *Indiana Bell Telephone Co.* (Dec. 1, 1955), 235 Ind. 1, 130 N. E. 2d 467, the Commission relied on *Public Service Commission of Indiana* v. *City of LaPorte* (1935), 207 Ind. 462, 193 N. E. 668, in its holding that the findings of the Commission would not be upset if they were sustained by substantial evidence, but this court repudiated that rule, and said:

"Hence, where a rate established by the Commission is attacked as confiscatory, the court may, upon its own independent judgment, review that issue as to both law and facts, to the end that constitutional rights may be protected. *Public Service Commission* v. *Ind. Bell. Tel. Co.* (1953), 232 Ind. 332, 347, 112 N. E. 2d 751, *supra; Public Serv. Comm.* v. *Indianapolis Rys.* (1948), 225 Ind. 656, 76 N. E. 2d 841, *supra; Staten Island Edison Corporation* v. *Maltbie* (1947), 296 N. Y. 374, 73 N. E. 2d.705, 707; *Opinion of the Justices* (1952), 328 Mass. 679, 106 N. E. 2d 259, and cases there cited; *St. Joseph Stock Yards Co.* v. *United States* (1936), 298 U. S. 38, 80 L. Ed. 1033, 56 S. Ct. 720, *supra; Ohio Valley Water Co.* v. *Ben Avon Borough* (1920), 253 U. S. 287, 64 L. Ed. 908, 40 S. Ct. 527, *supra.*"

In *St. Joseph Stock Yards Co.* v. *United States* (1936), 298 U. S. 38, 51, 52, 56 S. Ct. 720, 80 L. Ed. 1033, 1041, 1042, the majority opinion by Chief Justice Hughes reasoned:

"But the Constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation. When

the legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent the transgression of these limits of power. The legislature cannot preclude that scrutiny of determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, without multiplication of administrative agencies, is not one to be lightly regarded. It is said that we can retain judicial authority to examine the weight of evidence when the question concerns the right of personal liberty. But if this be so, it is not because we are privileged to perform our judicial duty in that case and for reasons of convenience to disregard it in others. The principle applies when rights either of person or of property are protected by constitutional restrictions. Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by

any legislative arrangement designed to give effect to administrative action going beyond the limits of constitutional authority. This is the purport of the decisions above cited with respect to the exercise of an independent judicial judgment upon the facts where confiscation is alleged."

Section 54-203, Burns' 1951 Replacement, should be construed in *pari materia* with Chapter 169 of the 1929 Acts, § 54-429, *et seq.*, Burns' 1951 Replacement, which is the general act concerning review of orders of the Commission. This latter statute gives a right of action "to vacate or set aside or enjoin the enforcement of any such decision, ruling, order, determination, requirement or direction, on the ground that the same is insufficient, unreasonable, unlawful, or procured by fraud or other unlawful methods." The complaint by the City did allege the order was unreasonable and unlawful. The Company did not attack the sufficiency of the complaint, and if the evidence disclosed the approved rates were too high the order would deprive the City of its property without due process of law, as well as offend Sections 12 and 21 of our Bill of Rights.[1] Moreover, the Company in its original brief did contend that "The end result of the trial court's decision would be confiscation of the Company's property contrary to Article I, Section 21, of the Indiana Constitution and the Fourteenth Amendment to the Constitution of the United States." If the Company had appealed from the Commission's

---

1. "All courts shall be open; and every man, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. . . ." Section 12, Article I, Constitution of Indiana.

". . . No man's property shall be taken by law, without just compensation; . . ." Section 21, Article I, Constitution of Indiana. See *Valparaiso Lighting Co.* v. *Public Service Comm.* (1920), 190 Ind. 253, 129 N. E. 13.

order on the ground the rates were confiscatory, the trial court would have been required to make its own independent, judicial inquiry and findings as to the adequacy of the rates to yield a reasonable return, but merely because the City appealed and contended the Commission's approved rates were too high should not change the standard by which the trial court is required to make its determination.

The anomalous position this court assumes in declaring one standard for a judicial review when a utility takes the appeal on rates, and another when a user and rate payer takes the appeal is at once apparent if both take an appeal from the same order, as each has a right to do. The utility can claim the rates are too low, and the user claim the rates are too high. If we should adhere to the standard adopted in *Public Service Commission of Indiana et al.* v. *Indiana Bell Telephone Co.* (Dec. 1, 1955), 235 Ind. 1, 130 N. E. 2d 467, *supra,* the trial court would make its own independent judicial inquiry and findings as to valuation, operating expenses, rates and return on the issues presented by the utility's appeal, while on the issues tendered by the user's appeal, under the rule adopted by the majority in the appeal at bar, the trial court would only find whether there was substantial evidence before the Commission to sustain its findings. The form and substance of the findings in each would be different. On the issues presented by the utility's appeal the findings as to valuation, operating expenses, rates and return would be what the court itself found from the evidence introduced before it, including of course the record before the Commission, while on the issues presented by the user's appeal, the findings would be as to whether there was substantial evidence before the Commission

as to each finding the Commission made as to valuation, operating expenses, rates and return.

It is idle to suggest that the correctness of the standard used by the trial court in reviewing the action by the Commission is not before us in this appeal. The Company and the Commission urge that the finding and order of the Commission should be affirmed if there was substantial evidence before the Commission to sustain each essential finding. If that is not the true standard this court judicially knows such to be erroneous as a matter of law, and it is its duty to so declare it. Nor would a single standard requiring the trial court to make its own independent judicial inquiry and finding on fair valuation of the property used and useful in producing the service, reasonable operating expenses, a fair return on the valuation, and the amount to be realized by the rates, violate constitutional requirements for separation of legislative and judicial powers. The adoption of such a standard in this appeal does not fix utility rates any more than the court fixes rates when it determines whether certain rates would deprive a utility of its property without due process of law.

The City has many uses for water which are indispensably necessary for it to function as a municipal corporation of this state. It is not free to contract with the Company for many of its water services, and the state under the police power fixes the price that shall be paid by the City. In fact the City could not build its own water system for years in the future if it chose to do so. If the rates are fixed unreasonably high, it must pay them or have its water services shut off thus impairing the exercise of its corporate powers, and it is thereby deprived of its property without due process of law under the Fourteenth Amendment just the same as the Company would be deprived of its property

without due process if the rates were too low. The case of an individual user is just as precarious as the City, for water is a necessity which he must have, and the average user is not in a position to build and maintain his own water system. Even though we have not found any case where a customer and user contended that excessive rates deprived him of his property without due process of law, this is what happens to him if he is compelled to pay excessive rates.

On March 18, 1954, the Commission made its finding and order authorizing an increase for metered water service effective from and after April 1, 1954. It found that the fair value of the Company's used and useful property, including material and supplies, was not less than $36,500,000. This finding was prima facie correct on appeal to the trial court (§54-428, Burns' 1951 Replacement), and unless there was evidence of probative value that this valuation was excessive, any finding by the trial court that the fair value was less than that found by the Commission would be contrary to law and not sustained by sufficient evidence. The only evidence to contradict the Commission's finding came from the witness Alex Van Praag, Jr., who testified for the City.

This witness qualified as an expert on valuations, and after detailing how he arrived at various valuations, testified that it was his opinion that the fair value of the physical properties of the Company was $32,400,-000. He said this was a judgment figure, and not an appraisal for sale purposes. However, he had prepared the City's exhibit No. 4, which was introduced in evidence, which disclosed without any doubt that he was basing that opinion on original cost less depreciation, plus materials and supplies and construction work in progress. The same chart disclosed that when he used reconstruction cost new, less observed depreciation,

plus material and supplies and construction work in progress, he arrived at a valuation of $47,177,320.00, which is more than ten million dollars higher than the valuation found by the Commission, and which the City now alleges to be excessive.

We judicially know there has been an inflation in values since 1939. A utility corporation and its stockholders take the gain from an increase in values of its property, and they stand the loss when values depreciate during a time of falling prices or a depression, just the same as any other corporation and its stockholders may benefit or lose when the value of the corporate property goes up or down. If the state condemns a shack in shanty town the owner is compensated according to its value when taken, and not according to what it cost him. The Federal Constitution and the Indiana Constitution both protect him, and they protect corporate enterprise with equal fairness by prohibiting confiscation of its property either directly or indirectly. Utilities are not bought and sold in any market place so that a market value can be thus established, and in an area like Indianapolis, with its growth or population and industry, reproduction cost new less depreciation cannot be disregarded in fixing a valuation for rate making purposes. Mr. Praag's "judgment" opinion on value was without probative value and should have been ignored by the trial court.

There was no evidence before the trial court to sustain its finding that the Commission's valuation of the company at not less than $36,500,000 was unreasonable, unjust, unlawful and excessive, even assuming such finding was not a statement of conclusions. From finding No. 30 it is apparent that the trial court used as one basis for upsetting the valuation by the Commission the assessed valuation of the company's land for taxa-

tion. The opinion by Judge Arterburn adequately disposes of that erroneous basis for valuation.

It should be observed that neither the finding by the Commission nor by the trial court observed the well known law that a recital of evidence or testimony is not a finding. Although it is surplusage, it cannot take the place of a finding of ultimate fact. However, the trial court made no findings that the Commission's findings did not follow statutory requirements as previously construed by us.[2]

There is a mathematical error in the trial court's finding No. 24 based on the testimony of Mr. Carl Cecil before the Commission. By the time the trial was had, some revenue experience with the new rates was available. In the light of this new evidence the highest estimate for the new rates estimated they would have produced in a full year of operation the net sum of $2,102,000. The Commission by its amended order reduced the rates by the sum of $111,000, leaving the highest estimate then in the sum of $2,091,000. The

2. "Section 54-112 Burns', 1933 (Supp.), in defining the duties of the Commission states: 'The commission created by this act shall in all controversial proceedings heard by it be an impartial fact-finding body and shall make its orders in such cases *upon the facts impartially found by it.*' (Our italics.) These facts should be found specially and not generally. The findings must be specific enough to enable the court to review intelligently the Commission's decisions." *Kosciusko County, Etc.* v. *Public Service Comm.* (1948), 225 Ind. 666, 674, 77 N. E. 2d 572. This holding was followed in *Wabash Valley Coach Co.* v. *Arrow Coach Lines Inc.* (1950), 228 Ind. 609, 94 N. E. (2d) 753; *Public Service Comm.* v. *Ft. Wayne U. Ry. Co.* (1953), 232 Ind. 82, 111 N. E. 2d 719, and *Indianapolis & So. Motor Exp. Inc.* v. *Public Service Comm.* (1953), 232 Ind. 377, 112 N. E. 2d 864. In the latter case at page 382 the court said: "A statement as to what various witnesses testified to is not a finding of ultimate facts. Flanagan, Wiltrout & Hamilton, Ind. Tr. & App. Pr. §1731, p. 350; 3 Lowe, Works' Indiana Practice §53.24, p. 299; 2 Gavit Ind. Pl. & Pr. §432, p. 2365."

City's expert on rate of return recommended a 5.5% rate of return on valuation, which was the lowest rate proposed by any witness. Since we have already determined that the Commission's valuation of $36,500,000 was proper, a 5.5% return on this would yield $2,007,-500, which is but $83,500 less than the estimated return the amended rates would yield. It was conceded that the Company was continually making additions to its property used and useful in producing its service, and when this fact is considered it becomes apparent that the amended rates as determined by the Commission were reasonable and just.

The opinion by the trial court precedes the special findings of facts and conclusions of law, and fails to comply with the ordinary legal understanding that an opinion should state the facts and the law by which the court's decision was reached. Such an opinion becomes of great assistance to this court if the judgment be appealed here, or to the Commission in any subsequent proceedings before it. There should have been a special finding as to the fair valuation of the Company's property used and useful at the time of trial, what would be a reasonable rate of return on that property, the reasonable and necessary operating expenses in producing the service, and the revenues to be derived from the new rates. The burden of proof on each of these findings was upon the City, and a failure to find on an essential fact is in legal effect a finding against the party having the burden on that issue. *Newman* v. *Newman* (1943), 221 Ind. 432, 48 N. E. 2d 455; *City of Frankfort* v. *Easterly* (1943), 221 Ind. 268, 46 N. E. 2d 817, 47 N. E. 2d 319; *Wabash Valley Coach Co.* v. *Turner* (1943), 221 Ind. 52, 46 N. E. 2d 212. Therefore, the conclusions of law are in error.

The case was fairly tried before the Commission, and the judgment of the trial court should be reversed with instructions to restate its conclusions of law in conformity with our opinion, and to enter judgment accordingly.

## CONCURRING OPINION

ACHOR, J.—I agree that we cannot properly establish an unequal standard of judicial review in utility rate cases, with one standard applicable to the utility and another to the rate payer. However, I do not consider that the majority opinion authorizes such a double standard. Nor do I consider the rule formerly announced by the court in the case of *Public Service Commission* v. *City of LaPorte* (1935), 207 Ind. 462, 193 N. E. 668, to be repudiated.

In this case the rate fixing order of the Public Service Commission was attacked as "unreasonable and unlawful." There was no allegation or contention of "fraud or other unlawful methods" as provided by §54-429, et seq., Burns' 1951 Repl. Neither was the rate challenged as being "confiscatory" and therefore unconstitutional (under Art. 1, §21 of the Constitution of Indiana and the Fourteenth Amendment to the Constitution of the United States) and subject to judicial review, on the basis of both the law and the facts, independent of any statute. Therefore, the only question for judicial review by this court in this case was whether or not in the sense that it is *not supported* by *substantial evidence,* the order of the Commission is "unreasonable or unlawful," which was the basis of judicial review upon which the LaPorte case, *supra,* was decided.

The rule is stated in the majority opinion as follows:

"(3) For the trial court to stay within its constitutional jurisdiction and not infringe upon another

branch of the government, the judicial review of the order of the Public Service Commission in this case is limited to:

(a) A determination of whether or not the order or finding of the Commission is unreasonable (and therefore unlawful) in the sense that it is not supported by substantial evidence.

(b) A determination of whether or not the order of the Commission is unreasonable or unlawful in the sense that it is contrary to law because of a violation of certain legal principles or statutory requirements or the consideration of or failure to consider certain factors or elements which it is apparent improperly influenced the result or final order."

As stated in the majority opinion, the words "insufficient, unreasonable and unlawful," as used in the statute (§54-429, et seq., Burns' 1951 (Repl., supra) "fixing the grounds of review in this case, have only the limited content or meaning specified above. This is necessary in order to give such statute granting a judicial review constitutional life. . . ."

It is my understanding that the standard of judicial review above announced and relevant to this case applies to both the utility and the rate payers alike.

The opinion is not concerned with the standard of judicial review where the issue is "confiscation" or procurement by "fraud or illegal methods," and I do not consider that it establishes unequal standards of judicial review where such issues may be laid before the court. Therefore, I concur in both the reasoning and result of the majority opinion.

NOTE.—Reported in 131 N. E. 2d 308.