472 N.E.2d 938 (1984)
CITIZENS ACTION COALITION OF INDIANA, Inc.; City of Gary, Indiana; Bailly Alliance; City of Fort Wayne, Indiana, Appellants,
v.
NORTHERN INDIANA PUBLIC SERVICE CO., Inc., et al., Appellees.
No. 2-1082A357.
Court of Appeals of Indiana, Second District.
December 27, 1984.
Rehearing Denied February 7, 1985.
*939 William Julian, II, Michael A. Mullett, Indianapolis, for Citizens Action Coalition of Indiana, Inc.
Arthur A. Daronatsy, Gary, for City of Gary, Ind.
William Drozda, Gary, for Bailly Alliance.
Frederick F. Eichhorn, Jr., William H. Eichhorn, Charles W. Webster, Eichhorn, Eichhorn & Link, Hammond, for appellees.
NEAL, Presiding Judge (writing by designation).

STATEMENT OF THE CASE
This appeal is brought by Citizens Action Coalition of Indiana, Inc.; City of Gary, Indiana; Bailly Alliance; and City of Fort Wayne, collectively referred to as intervenors, from an order of the Public Service Commission of Indiana (Commission) fixing electric rates for Northern Indiana Public Service Company (NIPSCO).
We reverse.

*940 STATEMENT OF THE FACTS AND ISSUES
Commencing in 1970, NIPSCO embarked upon a project to construct a nuclear generating plant designated as Bailly N-1 (Bailly). Because of delays occasioned by litigation, opposition to licensing provisions involving safety, and escalating costs, NIPSCO cancelled the project on August 21, 1981, after expending $205,724,170.00. The facility was never completed and was never placed in service. The Commission permitted an increase in NIPSCO's rates, by which, over 15 years it could recover $190,746,580.00 of the Bailly costs from the rate payers.
The parties agree that the sole issue is whether the Commission acted contrary to law in permitting NIPSCO to collect rates from the rate payers to amortize the sunk costs of the abandoned Bailly Project.
NIPSCO has reminded us of our standard of review. Rate making is a legislative and not a judicial function. The legislature has seen fit to establish the Public Service Commission for the express purpose of hearing evidence determining utility rates, and we are aware that we cannot substitute our judgment in place of that of the Commission. State ex rel. Indianapolis Water Company v. Boone Circuit Court, (1974) 261 Ind. 583, 307 N.E.2d 870; Bethlehem Steel Corporation v. Northern Indiana Public Service Company, (1979) Ind. App. 397 N.E.2d 623.

DISCUSSION AND DECISION
At the onset we shall review applicable Indiana cases and statutes which govern ratemaking. Under IND. CODE 8-1-2-4 a charge made to the consumer is for any service rendered. IND. CODE 8-1-2-6 provides that the Commission "... shall value all property of every public utility actually used and useful for the convenience of the public at its fair value ..." in establishing reasonable rates. In City of Evansville v. Southern Indiana Gas and Electric Company, (1974) 167 Ind. App. 472, 339 N.E.2d 562, Judge Staton set forth the prevailing and well-established methodology of rate making in Indiana. Because of the gravity of this issue, we set out these notions in full:
"The Commission's primary objective in every rate proceeding is to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors. IC 1971, 8-1-2-4 (Burns Code Ed.); Federal Power Comm'n. v. Hope Natural Gas Co. (1944), 320 U.S. 591, 605, 64 S.Ct. 281 [289], 88 L.Ed. 333. Accordingly, the initial determination that the Commission must make concerns the future revenue requirement of the utility. This determination is made by the selection of a `test year'  normally the most recent annual period for which complete financial data are available  and the calculation of revenues, expenses and investment during the test year. The test year concept assumes that the operating results during the test period are sufficiently representative of the time in which new rates will be in effect to provide a reliable testing vehicle for new rates.
The utility's revenues minus its expenses, exclusive of interest, constitute the earnings or the `return' that is available to be distributed to the utility's investors. Allowable operating costs include all types of operating expenses (e.g., wages, salaries, fuel, maintenance) plus annual charges for depreciation and operating taxes. While the utility may incur any amount of operating expense it chooses, the Commission is invested with broad discretion to disallow for ratemaking purposes any excessive or imprudent expenditures. IC 1971, 8-1-2-48 (Burns Code Ed.).
Test-year revenue and expense data, however, may not always provide a suitable basis for determining rates. Because of abnormal operating conditions such as unusual weather or atypical equipment outages, test-year revenues and expenses or both may not faithfully reflect normal conditions. If test year results are unrepresentative, appropriate *941 adjustments must be made to correct for the effects. This type of adjustment is commonly labeled an `in-period adjustment'. Since test-year results are relevant for a determination of utility rates only to the extent that past operations are representative of probable future experience, further adjustments are usually necessary to account for changed conditions not reflected in test-year data. For example, if future operations will be required to bear higher tax rates or higher levels of wages and salaries than were incurred during the test year, test-year data must be adjusted to reflect increased costs. This type of an adjustment to test-year data is usually referred to as an `out-of-period adjustment'.
After the utility's existing level of earnings or `return' is established, the amount of investment in utility operations  the `rate base'  is determined by adding the net investment in physical properties to an allowance for working capital. The `rate base' consists of that utility property employed in providing the public with the service for which rates are charged and constitutes the investment upon which the `return' is to be earned. Since traditional rate-making methodology utilizes the `historical' test year, the `rate base' is usually defined as that utility property `used and useful' in rendering the particular utility service. IC 1971, 8-1-2-6.
* * * * * *
Under traditional regulatory concepts, utility company shareholders and bond-holders, not the consumers, furnish the capital necessary for the operation of the business. See, e.g., Railroad Comm'n. v. Cumberland Tel. & Tel. Co., (1909), 212 U.S. 414, 424, 29 S.Ct. 357 [361], 53 L.Ed. 577; Lindheimer v. Illinois Bell Tel. Co. (1934), 292 U.S. 151, 169, 54 S.Ct. 658 [665], 78 L.Ed. 1182. The consumer pays a fair return on the utility's capital and in addition pays the costs of operation including taxes, but it is well-established that the company's investors, not its consumers, must contribute the utility's capital. See, e.g., City of Alton v. Commerce Comm'n. (1960), 19 Ill.2d 76, 165 N.E.2d 513; In re Pacific Gas & Elec. Co. (1961 Cal.Pub.Util.Comm'n), 38 P.U.R.3d 1; In re Public Serv. Co. (1960 Colo.Pub.Util.Comm'n), 34 P.U.R.3d 186; In re Washington Water Power Co., (1960 Idaho Pub.Util.Comm'n), 33 P.U.R.3d 88; In re Columbia Gas, Inc. (1959 Ky.Pub.Serv.Comm'n), 36 P.U.R.3d 401; In re Niagara Mohawk Power Corp. (1961 N.Y.Pub.Serv.Comm'n), 40 P.U.R.3d 401; In re Cincinnati Gas & Elec. Co. (1960 Ohio Pub.Util.Comm'n), 33 P.U.R.3d 1.
Our Public Service Commission Act reflects the traditional notion that the `fair rate of return' which a regulated utility is permitted to earn must be based upon capital advanced by its investors. IC 1971, 8-1-2-6 (Burns Code Ed.) provides that the Commission `... shall value all property of every public utility actually used and useful for the convenience of the public at its fair value ...' in establishing `reasonable and just' rates. The Commission's `used and useful' standard requires: (1) that the utility plant be actually devoted to providing utility service, and (2) that the plant's utilization be reasonable necessary to the provision of utility service. See, e.g., In re Indianapolis Water Co. (1964 Ind.Pub.Serv. Comm'n), Docket No. 30,022, June 17, 1964 (property held for future use was not `reasonably necessary'); In re Indianapolis Water Co. (1958 Ind.Pub.Serv. Comm'n), 26 P.U.R.3d 270 (plant used only during peak demand period was `reasonably necessary'; In re Indiana Gas & Water Co., (1952 Ind.Pub.Serv. Comm'n), Docket No. 23,584, Sept. 25, 1952 (property under construction was not `actually in service')."
339 N.E.2d at 568-569.
Our Indiana Supreme Court has held that customer contributions in aid of construction cannot be included in the fair value of the property upon which the utility rates are determined. Public Service Commission of Indiana v. City of Indianapolis, *942 (1956) 235 Ind. 70, 131 N.E.2d 308. In that case the court stated:
"A great amount of time and effort is expended by the City in attacking a former order of the Commission made in 1951 fixing the rates at that time, and attempting to demonstrate that such taxes were unreasonable and exorbitant. The rates fixed in the 1951 order have been adjudicated and the court at this late date has no power or jurisdiction to go back and re-examine such an order. Assuming the Commission had erred in 1951 and granted excessive rates, of which there is no showing, there would not be the slightest justification for the Public Service Commission granting the Company, any rate other than that which would produce a reasonable return upon the present fair value of its used and useful property. The theory propounded by the City cuts both ways. If its contention were true, then a rate established in 1941 which was insufficient or caused a loss to the Company, would entitle the Company at this time to have a rate established by which it could recoup such a loss or deficiency. Past losses of a utility cannot be recovered from consumers nor can consumers claim a return of profits and earnings which may appear excessive. 73 C.J.S., Public Utilities,, Sec. 25(d), p. 1045; 43 Am.Jur., Public Utilities and Services, Sec. 162, 163, p. 678.
The chances of a loss or profit from operations is one of the risks a business enterprise must take. The Company must bear the loss and is entitled to the gain depending upon the efficiency of its management and the economic uncertainties of the future after a rate is fixed. Were it not so, a premium would be placed upon inefficiency, waste and negligence in management. It is better policy to encourage thriftiness, saving and frugality on the part of a utility management. Such incentive inures eventually to the benefit of the consumers in succeeding rate hearings."
235 Ind. at 87-88, 131 N.E.2d 308.
L.S. Ayres & Company v. Indianapolis Power and Light Company, (1976) 169 Ind. App. 652, 351 N.E.2d 814, is also instructive. Relative to the function of the test year the court stated:
"The theory underlying the use of any test-year and adjustment method in the rate-making process demands that the data used provide an accurate picture of the utilitys operations during the period in which the proposed rates will be in effect. The test year may be analogized to the technique of stopping a film to examine one isolated frame. By freezing the action of the utility's operations in a convenient time frame, the Commission can observe the inherent interrelationships among rate base, expenses and revenues. This observation is crucial to the concept of the test period because a complete picture of these dynamic interrelationships can only be obtained when the rate base, expense and revenue components are examined in phase. Thus, rate base, expense and revenue data for an historical test year are meaningful for a determination of utility rates only insofar as past operations are representative of probable future experience. Significant changes in a utility's operating structure, such as rapid plant expansion, may render even the most current historical data inadequate as a basis for predicting the results of future operations."
351 N.E.2d at 828-829.
The court went on to rule that unnecessary plant capacity is not used or useful property for rate purposes and should not be included in the rate base. Bad business judgment in that regard is a risk of the utility and must not be shouldered by the ratepayers. Before any tangible plant property can become used and useful for the convenience of the public it must be efficiently integrated into a functioning system. However, certain costs related thereto, including additional plant developmental costs such as training, records, procedures, tune-up, and customer loan growth, are allowable.
On the other hand, deferred tax reserve accounts cannot be placed in the *943 rate base because they are customer contributed capital. Where generating plants are used partly for retail service and partly for wholesale purposes, costs and the rate base must be allocated. City of Evansville v. SIGECO, supra. Past losses cannot be recouped in the form of a 48% federal tax rate as a cost which would never be paid because of a loss carry back. Citizens Energy Coalition, Inc. v. Indiana & Michigan Electric Company, (1979) Ind. App., 396 N.E.2d 441 (transfer denied). A rate may not be imposed to operate retroactively. Indiana Telephone Corp. v. Public Service Commission of Indiana, (1960) 131 Ind. App. 314, 171 N.E.2d 111. Even excessive depreciation above and beyond capital consumption used to build additional plan facilities is prohibited as capital contributed by ratepayers. Lindheimer v. Illinois Bell Telephone Co., (1934) 292 U.S. 151, 54 S.Ct. 658, 78 L.Ed. 1182.
The issue here of charging consumers for abandoned capital projects has not been directly approached in Indiana. The following are authorities from other jurisdictions which purport to have dealt with this problem. Nepco Municipal Rate Committee v. Federal Energy Regulatory Commission, (D.C. Cir.1981) 668 F.2d 1327, cert. denied; New England Power Company v. Federal Energy Regulatory Commission, (1982) 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329; Union Electric Company v. Federal Energy Regulatory Commission, (8th Cir.1981) 668 F.2d 389; San Diego Gas & Electric Co., (Cal.Pub.Util.Comm'n 1979) 31 P.U.R.4th 435; Re Central Illinois Light Co., (Ill. Commerce Comm'n 1983) 57 P.U.R.4th 351; Re Boston Edison Co., 46 P.U.R.4th 431; Re Detroit Edison Co., (Mich.Pub.Serv.Comm'n 1983) 52 P.U.R.4th 318; Atlantic City Electric Co., (N.J.Bd. Pub.Util. 1983) 51 P.U.R.4th 109; Re Rochester Gas & Electric Corp., (N.Y.Pub.Serv. Comm'n 1982) 45 P.U.R.4th 386; Duke Power Co., (N.C.Util.Comm'n 1982) 49 P.U.R.4th 483; mod. (1983) 51 P.U.R.4th 141; Central Vermont Public Service Corp., (Vt.Pub.Serv.Bd. 1982) 49 P.U.R.4th 372; contra, Arizona Public Service Co., (Ariz. Corp.Comm'n 1980) 38 P.U.R.4th 547; Re Union Electric Co., (Mo.Pub.Serv.Comm'n 1983) 57 P.U.R.4th 169; Office of Consumers' v. Public Utilities Commission, 67 Ohio St.2d 153, 423 N.E.2d 820; Pacific Power & Light Company v. Public Service Commission, (1984) Wyo., 677 P.2d 799.
The following rulings of regulating bodies were cited in footnotes in the case of Office of Consumers Counselor v. PUC, supra:
"Re San Diego Gas & Electric Co. (Cal. Pub.Util.Comm. 1979), 29 P.U.R. 4th 613; Re Potomac Electric Power Co. (Md. Pub.Ser.Comm. 1977), Order No. 6999; Re Consumer Power Co. (Mich.Pub.Ser. Comm. 1975), Case No. F-700; Re Northern States Power Co. (Minn.Pub.Ser. Comm. 1977), Dkt. E-0021 GR-76-934; Re Public Service Electric and Gas Co. (N.J.Dept. of Energy Bd. of Pub.Util. 1980), Dkt. No. 794-310; Re Consolidated Edison Co. of New York (N.Y.Pub. Ser.Comm. ___), Case No. 9187; Re Carolina Power & Light Co. (N.C.Util. Comm. 1979), Dkt. No. E-2, Sub 352; Re Gulf States Utilities Co. (Pub.Util. Comm. of Texas 1979), Dkt. No. 2677; Re Virginia Electric & Power Co. (Va. Corp.Comm. 1978) 29 P.U.R. 4th 65; Re Wisconsin Electric Power Co. (Pub.Ser. Comm. of Wis. 1980), Case No. 05-01-3; Re Potomac Electric Power Co. (D.C. Pub.Ser.Comm. 1979), 29 P.U.R. 4th 517; Re Arizona Public Service Co. (Ariz. Corp.Comm. 1980), Decision No. 31009; Re Northern States Power Co. (Pub.Ser. Comm. of N.D. 1980), Case No. 10,097."
423 N.E.2d 826.
It is to be noted that only four of the above authorities are cases decided by courts of review and the remainder are rulings by a regulatory body. We will treat specifically those four.
The case of Office of Consumers' Counsel v. P.U.C., supra, is a case from the Supreme Court of Ohio which is directly on point. There, the question was whether the P.U.C. acted lawfully and reasonably in permitting the utility to treat its investment in four cancelled nuclear generating *944 plants as amortized costs. The arguments put forth by the utility and the consumers were the same as those made here. The P.U.C. argued that an expenditure can be considered a cost of service if it fails in fact to achieve its intended purpose, if that expense was logically calculated to provide utility service at a reasonable cost. Authority for such, P.U.C. claimed, is found in those statutes which require utilities to provide adequate service.
While noting that the overwhelming weight of authority from other jurisdictions supports the position of the Commission, the Ohio court observed that none of the rulings on this precise issue represented the opinion of the highest court of the jurisdiction, but were derived from regulatory decisions. The court, treating the foreign regulatory decisions as advisory only, addressed Ohio law. Under Ohio law, R.C. 4909.15(A)(4), the service related costs that a utility may recover from its ratepayers is determined as follows:
"The public utilities commission, when fixing and determining just and reasonable rates, fares, tolls, rentals, and charges shall determine:
* * * * * *
The cost to the utility of rendering the public utility service for the test period... ."
The court viewed the situation as a request to treat as service related, costs of investment that never provided any service whatsoever to the utility customer. The court stated:
"We seriously question whether the General Assembly contemplated that the commission would treat the type of expenditures controverted herein as costs under R.C. 4909.15(A)(4). The now terminated nuclear plants represented a major capital investment that ultimately would have been included in the rate base under R.C. 4909-15(A)(1), had the projects not been cancelled. It is our opinion that R.C. 4909-15(A)(4) is designed to take into account the normal, recurring expenses incurred by utilities in the course of rendering service to the public for the test period.[8] A non-exhaustive list of such expenses would include reasonable expenditures for repairs, maintenance, personnel-related costs, administrative expenses and taxes. The extraordinary loss sustained by CEI in connection with the terminated nuclear plants cannot be transformed into an ordinary operating expense pursuant to R.C. 4909.15(A)(4) by commission fiat. The commission's statement that `[c]ancellation does not create a past loss, but gives rise to a current cost' is unpersuasive. Under this rationale we question whether there could ever be a `past loss' the return of which would not be recoverable in future rate-making proceedings notwithstanding the commission's assertion to the contrary. The commission's characterization of the investment in the four terminated plants as `cost' under R.C. 4909.15(A)(4) in light of what we perceive to be the legislative intention underlying that section is unreasonable."
[8] Appellants contend that the `direct, primary benefit' test enunciated in Cleveland v. Pub. Util. Comm. (63 Ohio St.2d 62, 406 N.E.2d 1370), supra, is applicable to the case at bar. We disagree. The direct primary benefit standard should not be wrenched from the institutional advertising expenses and charitable contributions context in which it arose.
(Original footnote).
423 N.E.2d at 827.
The case of Pacific Power and Light Company v. Public Service Commission, (1984) Wyo., 677 P.2d 799 affirmed an order of the regulatory commission denying amortization of the cost of a cancelled nuclear plant by means of a rate to be paid by consumers. The statutes which the court construed were W.S. 1977, Sec. 37-1-102(a), which reads:
"The term rate when used in this act shall mean and include ... every ... charge or other compensation for service rendered or to be rendered .. . and every ... practice, act, requirement or privilege in any way relating to such ... charge or other compensation."
*945 and W.S. 1977, Section 37-2-119 of Wyoming Act. This latter provision states the commission may value:
"... the property and business of any public utility, used and useful for the convenience of the public, and all matters affecting or influencing such cost or value... ."
Emphasizing the used and useful language the Wyoming Commission found that the investment in an abandoned nuclear plant could not properly be considered in fixing rates. The court agreed, stating:
"If the projects had been successful and had gone on line for production of electricity for public convenience, the cost or value would have been properly considered in establishing a rate base. Since they were not successful and were only partially constructed, they could never become `property' of a `used and useful' nature. Although the project undertakings might conceivably be part of the `business of PP & L, we need not determine such inasmuch as the business activity relating to the projects was not current so as to meet the `used and useful' requirement, as the `used and useful' status must be as of the time of rate consideration.
Although the investment, expenses and obligations resulting from the projects do not conform to the `used and useful' concept, PP & L contends that they could still qualify for consideration in establishing a rate base if they are a prudent, reasonable and proper expense of operation. Other jurisdictions have dealt with the obligations herein considered as operating expenses and not as property under the `used and useful' principle.
We cannot accept the investment expenses, and obligations incurred in construction, or intended construction of property which would normally qualify as `used and useful' for inclusion in a rate base as an operating expense. An operating expenses includes:
`In general, various particular expenses of a public utility are properly chargeable to expense of operation, including any legitimate expense contributing to the better management or greater efficiency of the utility, a reduction of its investment, or an increase in its operating return. * * *' 73B C.J.S. Public Utilities, Sec. 36, p. 234.
* * * * * *
In contending that the charges were `operating expenses,' PP & L argues that a reasonable and prudent test should be allowed. We need not consider this test insofar as it applies to `operating expenses' since these charges were not `operating expenses' as that term is generally considered.
It is probable that PP & L would not contend these expenses to be `operating' ones if the projects were completed. PP & L would then own a percentage of property; and it would expect to have the cost of the project included in the amount attributed to its `used and useful' property in establishing a rate base.
The argument in this case results from the situation in which PP & L suffers financial loss due to failure of a project intended to become `used and useful' in the service of the public. PP & L wants to include the loss in its financial picture whereby an increase in rates will eventually pay for the loss, i.e., the loss will be borne by the consumers. PP & L believes this proper inasmuch as service rendered by an electric power utility is limited by the availability of the supply of the product it furnishes. The same can be said of some other utilities. A prudent and reasonable attempt to secure or preserve such supply could well be considered a service rendered on behalf of the consumers. When the life of a utility is limited by such supply, amortization of an entire plant investment has been allowed. PP & L contends that successful effort in this endeavor would rebound to the benefit of the consumers by furnishing a more abundant and cheaper supply of the product and, thus, the failure of the effort should be at the expense of the consumers.

*946 On the other hand, PSC considers the failure of the projects as one of the risks incurred by PP & L when it entered into them. PSC would have the stockholders of PP & L bear the loss since the decision to embark upon the project was made by their representatives who had an opportunity to calculate the risk and to be governed by such calculation. If PP & L gauged the risk with the intention that the loss would be borne by the consumers, there would be no risk at all for PP & L (the stockholders). This fact might encourage PP & L to venture into activities having a very small chance of economic success with the knowledge of no loss to it should the activity fail and of great gain should the small chance of success occur.
If the consumers are to take the risk, it would seem that they should have some say as to whether or not the projects are to be undertaken. Only PSC is properly in a position to be concerned with the consumer interest in consideration of the propriety of the risk activity and to balance the interests of the consumer and the utility.
677 P.2d 805-806 (citations omitted).
The court concluded that in Wyoming, as well as in other states, statutory authority exists whereby if prior approval is obtained from the commission based upon prior determination of the risks involved, costs might be passed on to the ratepayers. However, such was not done in this case.
The cases of Nepco and Union Electric, supra, concern actions of the Federal Energy Regulatory Commission, which was created by and operates according to federal statutes and regulations as opposed to state law. In these cases, rulings of the FERC which allowed the recovery, over time, of expenditures made on abandoned nuclear plants, were affirmed. In neither case were these costs allowed to be added into the rate base to be paid by consumers in the form of higher utility rates. In Nepco, the costs were amortized over a five year period, while in Union Electric the expenses were paid by wholesale customers and investors were denied a return on the abandoned plant.
In Nepco arguments were made by the appealing utility that such action of the FERC denied it an opportunity to earn a return on prudent investments in a cancelled project and thus denied it just compensation in violation of the Fifth Amendment. The court, while noting that property is includable in the rate base only when it is used and useful, and thus in service, reasoned that it was inequitable to place the entire loss of expenditures on the utility and that a balancing approach was proper. The court distinguished that case from one where property was once used and useful but later retired from service. It likewise noted that expenditures for research on alternative fuels are properly includable in the rate base.
In Union Electric, the court determined that penalizing the utility for a decision which appeared rational at the outset would discourage construction of needed facilities. Putting the risk of cancellation solely on investors would increase the cost of money for projects because the risk would demand a higher return. Both courts concluded that while contrary arguments could be made, FERC's decision, based on the underlying assumption that the original outlay was reasonably prudent, justified the utilities' recovery of expenditures lost when changing conditions made the completion and operation of the nuclear facilities unfeasible.
As seen, and as argued by the intervenors, the present order of the Commission violates the traditional concepts of rate making as they exist in Indiana. In exchange for the monopoly, a utility is subject to regulations.
First, the project was, at its inception, a capital expenditure and capital must be furnished by investors. City of Evansville v. SIGECO, supra. Consumption of capital can be reimbursed to the utility by the ratepayers only by way of depreciation once the property is in service. NIPSCO attempts to convert the capital loss to a *947 future expense by declaring, by accounting fiat, that once the Bailly Project was abandoned it became a future expense. Such argument is unpersuasive. See Office of Consumers' Counsel v. PUC, supra. This imposition of a rate amounts only to a replenishment of capital; an obligation of utility stockholders and investors.
Secondly, even if the loss was an expense it was an expense incurred between 1970 and 1981. As shown above, old losses cannot be recouped through future rates. P.S.C. v. Indianapolis, supra. Nor can rates be imposed to operate retroactively. NIPSCO argues that since the loss was realized in the test year, 1981, and adopted by the Commission, it became a current expense which could be considered in determining future rates. NIPSCO misrepresents the office of the test year which is merely that of an historical study. See L.S. Ayres, supra; City of Evansville v. SIGECO, supra. Losses incurred in the test year are relevant only to determine the adequacy of rates for operating costs in future years.
Thirdly, an asset cannot be considered in the rate base until it has been placed in service and this includes property under construction, property held for future use, property which exceeds capacity, and property used for wholesale, not retail purposes.
One of NIPSCO's subsidiary arguments is that since the result was not prohibited by IND. CODE 8-1-2-6(c) (prohibiting costs for image building, charitable and political contribution) or IND. CODE 8-1-2-48 (authorizing the Commission to disallow excessive rates) the rate can be charged. The Commission is a body possessing delegated powers and unless power and authority to act is found in a statute, it must be concluded that there is none. General Telephone Co. of Indiana v. Public Service Commission, (1959) 238 Ind. 646, 150 N.E.2d 891; See Office of Consumers' Counsel v. PUC, supra, footnote 8.
NIPSCO's principal argument adopted by the Commission, the wording and phrasing of which is gleaned from arguments made in the four foreign cases discussed above, is an equitable one. A brief outline of the utility's rationale is as follows.
NIPSCO is mandated under IND. CODE 8-1-2-4 to furnish adequate service, and to that end it must commence construction of generating facilities 8 to 10 years in advance. It is the Commission's responsibility to assure that the risk of such construction is not so great as to discourage an endeavor which was prudently commenced, and subsequently judiciously cancelled, by refusing the recovery of the costs after the project is terminated. The purpose of the Bailly Project was to provide abundant lowcost electricity beneficial to ratepayers. However, as a result of delays occasioned through no fault of NIPSCO; through litigation initiated to oppose its permit and the escalation of costs, the project became unfeasible. If the NIPSCO shareholders are forced to bear the entire risk, the officers will become ultra-conservative; users will be deprived of modern technology, the company will persevere on uneconomical projects, and the cost of capital will increase, which expense would in turn be borne by the ratepayers once the facility is placed in service.
NIPSCO then contends the financial soundness of the utility must be considered by the Commission as well as the protection of the ratepayers from unreasonable rates. Thus, the Commission must reach an overall result which is equitable, and strike a balance between these interests of the utility and the ratepayers. The entire loss, it concludes, should not be placed on NIPSCO.
NIPSCO's argument which is essentially a collection of bald assertions, amounts to a request that we dramatically transcend and expand the traditional rate making concepts in Indiana without statutory authority. We first note that NIPSCO's logic could be applied to any loss, any property under construction, or any situation where the utility felt threatened. It could even be used to support the utility's stock on the market. NIPSCO commenced the Bailly *948 Project with its own capital and capital raised for that purpose by the sale of securities. The prospectus warned of risk. We presume that NIPSCO was aware of the state's rate methodology. Had the project been completed, it would have been computed in the rate base at which time the investors would commence receiving a return on it. Ratepayers would not have shared in that return. Only after the project failed did NIPSCO desire to make the ratepayers a partner in the venture, which belated partnership would include only the loss. While NIPSCO, in its brief, uses such carefully chosen and more palitable words as "sharing the risk", the share of Bailly's loss it suggests should be shouldered by the unconsulted, unrepresented and captive ratepayers is all of the loss. NIPSCO emphasizes that this loss was not occasioned by its fault. However, we hasten to add the record does not disclose the failure to be the fault of the ratepayers either. As stated in PSC v. City of Indianapolis, supra, "The chances of a loss or profit from operations is one of the risks a business enterprise must take. The company must bear the loss and is entitled to the gain ...". 235 Ind. at 88, 131 N.E.2d 308. Bad business judgment is not a risk of the ratepayers, but a risk of the utility. L.S. Ayres, supra.
We accept the rationale stated by the Ohio Supreme Court, and the Wyoming Supreme Court as being most nearly akin to our statutes and methodology, and rule accordingly.
In conclusion, nothing in Indiana rate methodology envisions the result reached by the Commission, and we question whether the legislature ever contemplated such result. Permitting a utility to recover from the ratepayers the cost of a failed project, while at the same time denying a rate increase to recover the cost of plants with excess capacity, plants under construction, property held for future use, and losses from operation is illogical and incongruous to the extreme. Essentially NIPSCO requests a total replenishment of its lost capital, or a subsidy from the ratepayers. While subsidies to businesses in order to benefit the public at large are familiar, such are ordinarily created in legislative halls, and not by court decision or administration fiat.
For the above reasons, this cause is reversed and the Public Service Commission of Indiana is ordered to vacate any rate increase occasioned by Bailly N-1.
Judgment reversed.
YOUNG, J., concurs.
MILLER, P.J., dissents with opinion.
MILLER, Presiding Judge, dissenting.
I concur in a result which would eliminate almost half of the amortized costs of Bailly N-1 but respectfully dissent in all other respects. In other words, I would find the Bailly N-1 project a proper statutorily authorized service expense for approximately $105  108 million of the total $190 million authorized by the commission. However, I would remand for further consideration of a portion  engineering costs  of the statutorily authorized amount by the Commission.
The majority opinion reflects two basic flaws that could and will turn the laws regulating public utilities in Indiana topsyturvy. First of all, the opinion confuses the use of the rate base in determining a rate of return with the ultimate utility rates charged to consumers (see e.g., City of Evansville v. Southern Indiana Gas & Electric Co. (1974), 167 Ind. App. 472, 339 N.E.2d 562) and all to no avail because the inclusion of Bailly N-1 in the rate base is not even at issue here. Secondly and most importantly, is the majority's failure to consider Indiana statutory authority and its exclusive reliance instead upon statutes in Ohio and Wyoming, which bear only the slightest resemblance to Indiana's.[1] I believe *949 the majority opinion reflects instead a result-oriented inclination which does not even pay lip-service to the law of Indiana or the case as it is presented. I would address the issue raised by this appeal as follows:
On November 16, 1981, Northern Indiana Public Service Company (NIPSCO) petitioned the Public Service Commission of Indiana (Commission) for an increase in rates charged for electric and gas services rendered to its customers. Included in that petition was a request for the Commission's approval to amortize, and to thereby charge consumers, the over $205 million expended by NIPSCO before it cancelled construction of its Bailly N-1 nuclear generating station. After having eliminated amounts recovered through salvage, the Commission ordered the addition of $190,746,580 to NIPSCO's rates, to be amortized over a 15-year period. Three of the numerous intervenors in the rate case before the Commission (Citizens Action Coalition of Indiana, Inc., City of Gary, and Bailly Alliance)[2] appealed this order, contending the Commission's allowance of the costs of the Bailly project was contrary to law. After a careful study of the pertinent Indiana statutes and of relevant court and utility cases, I have come to the conclusion that NIPSCO can recover only a portion of the amount it claims is due on the cancelled project. I find the Commission erred in ordering the recovery of any allowance for funds used during construction, have eliminated amounts spent imprudently, and further question the propriety of some of the engineering expenses incurred during a period when no actual construction took place. I would therefore reverse and remand.

THE ISSUE
The Intervenors broadly attack the Commission's order as being contrary to law. The issue, as I view it, is more appropriately stated as follows:
How much, if any, of the costs of a cancelled nuclear generating station may be recovered by a public utility in Indiana?

THE FACTS
In 1970, in answer to what it perceived to be an ever-increasing demand for energy, NIPSCO applied to the Atomic Energy Commission (now the Nuclear Regulatory Commission) for a permit to construct a nuclear fuel generating facility on the shore of Lake Michigan, to be completed in 1976 at an estimated cost of $180 million. Four years and extensive hearings later, in May, 1974, NIPSCO received its construction permit, which projected an estimated 1979 completion date at a cost of $243 million. NIPSCO had begun pile testing and had sold a stock issue in April, 1974, but did not begin actual excavation until July, 1974.
In the meantime, various parties, who had intervened in the construction permit hearings,[3] appealed the permit issuance to the Atomic Safety and Licensing Appeal Board and, upon the Appeal Board's affirmance, to the Seventh Circuit United States Court of Appeals. In October, 1974, the Seventh Circuit stayed the construction permit and authorized hearings on another issue related to the actual construction, thereby halting work at the site during *950 partial excavation. The permit proceedings did not terminate until November, 1976, when the United States Supreme Court denied certiorari of the Seventh Circuit's second decision, holding the permit valid.[4] By this time, NIPSCO had revised the in-service date for Bailly to Spring, 1982, at a cost of $675 million.
NIPSCO remobilized its construction forces and continued excavation in January, 1977. Within a month, NIPSCO again revised its completion figures with late 1982 as the target date at approximately $705 million. In September, 1977, the Nuclear Regulatory Commission (NRC) requested NIPSCO suspend its construction until the agency could complete a review of the placement of the long piles planned for support of the facility. In December, 1977, NIPSCO notified the NRC that it would switch its planned foundation of long piles to one utilizing short piles, and eight months later, the NRC informed NIPSCO that it must drive test piles to confirm data on the short-pile proposal. NIPSCO responded by performing the required testing from August, 1978, until early December of that year. The pile testing in late 1978 proved to be the last construction activity at the site. In March, 1981, the NRC finally completed its review on the pile placement issue, finding NIPSCO's design acceptable. However, in July, 1981, the D.C. Circuit United States Court of Appeals ordered hearings on the matter be included in the NRC construction permit proceedings. Meanwhile, the Intervenors were again actively seeking either suspension or revocation of NIPSCO's construction permit, and the Department of the Interior was becoming actively involved in the environmental aspects of the facility. By mid-1978, NIPSCO had again altered its in-service date, this time to 1984 with an $850 million price tag.
In February, 1979, NIPSCO requested an amendment to its construction permit, projecting the facility would be completed in 1985. Not surprisingly, the Intervenors petitioned the NRC for hearings on the permit extension. NIPSCO then amended its request to the NRC for extension of its permit from a September 1, 1985 in-service date to December 1, 1987. Projected costs of Bailly now amounted to $1.1 billion. But in March, 1979, the incident at Three-Mile Island focused the NRC's attention elsewhere, and the NRC did not issue its Notice of Opportunity for Hearing until late November, 1979.
In February, 1980, residents of Porter County, Indiana (location of the Bailly site), requested the county Board of Zoning Appeals to revoke the 1974 improvement location permit issued for the Bailly site. Six months later, August, 1980, the Board refused to revoke the permit but ruled that it would require NIPSCO to obtain a special exception at a later stage in Bailly's construction. This decision generated even more litigation, this time in Porter Superior Court.
Also, in August, 1980, the Atomic Safety and Licensing Board issued a final order, providing a hearing on NIPSCO's construction permit extension and allowing certain petitioners to intervene. Shortly thereafter, various national environmental groups and the Department of the Interior began requesting supplemental environmental impact statements from the NRC on the effects of Bailly on Lake Michigan's National Lakeshore. By early November, 1980, NIPSCO again extended its completion date, to 1989, and in May, 1981, Bailly was projected to cost $1.815 billion if finished by that date. On July 10, 1981, the NRC informed NIPSCO the hearings would begin September 15, but by August 26, NIPSCO's Board of Directors had cancelled the project because it had determined the now $2.1 billion project could not be completed until 1990.
*951 Upon cancellation, the Bailly expenditures were categorized as follows:

Nuclear Steam Supply Equipment $40,109,984
Turbine Generator Equipment 6,893,792
Engineering Services 33,576,677
Buildings & Construction Facilities 14,781,750
Fuel 12,313,974
NRC Licensing Expenses 3,950,302
Construction Management 4,219,154
Miscellaneous Overheads 14,441,355
Allowance for Funds Used During Construction 69,327,511
Other 6,109,671
 ____________
 TOTAL $205,724,170

Record, p. 2061. After computing the recovery of certain expenses through salvage and adding costs of termination, the bottom line expenses NIPSCO presented to the Commission during the rate case amounted to $190,746,580.
The Commission's hearings were extensive and comprehensive, and at their conclusion, the Commission declared the following with respect to the amortization of the Bailly costs:
"We resolve the issue as to whether amortization will be allowed affirmatively. Indiana utilities are under statutory mandate to serve; `every public utility is required to provide reasonable, adequate service and facilities' (I.C. 8-1-2-4 and 8-1-2-69). The record in this cause established that in order for a utility to meet its mandate to serve, it must begin construction of coal-fired generating facilities 8 to 10 years in advance of the need therefor with longer periods for nuclear powered facilities. If, in order to comply with the laws, a utility must begin construction of generating projects many years in advance of the need for the power, it is the Commission's responsibility to assure that the risk in doing so is not so great as to discourage the endeavor. In 1971 when Petitioner began its effort to construct Bailly, N-1, nuclear power held great promise for efficient and economic power supply. Over the course of the years, the economic advantages of nuclear generation over other forms of generation began to deteriorate and ultimately the delays resulting from regulatory indecision on the federal level and the changing economics forced the cancellation of Bailly, N-1 in August of 1981. This Commission has previously allowed amortization of costs incurred in abandoned and cancelled projects (Cause No. 32079 Dec. 12, 1979); (Cause No. 36318 June 10, 1981).[[5]] The amount of the amortization in prior proceedings was not as great as here, but the principle is the same. We find that the Petitioner prudently began construction of Bailly, N-1 and that upon its cancellation, it became an extraordinary cost of service loss incurred in an effort to provide energy for the consumers on Petitioner's system. The loss occurred with the cancellation. The Bailly, N-1 project was a reasonable undertaking by Petitioner to meet its duty to serve. The fact that the project was opposed by some for safety and environmental reasons cannot be given weight in this decision. The site locations, safety, environmental and many other issues were litigated in the Construction Permit proceedings, decided in Petitioner's favor by the agency with the jurisdiction to do so, the Nuclear Regulatory Commission (NRC), and reviewed and ultimately approved by the United States Court of Appeals for the Seventh Circuit and the United States Supreme Court.
The allowance of amortization of the Bailly, N-1 costs should not be confused with an allowance of a return on the value of a utility plant which is not used *952 and useful in the utility's service. The Petitioner did not seek to earn a return on its investment in Bailly, N-1 during the period of amortization and no return on the investment will be provided in this order. The authorized amortization is to permit the Petitioner to recover the sunk costs put forth in a reasonable effort to meet the mandate to serve, which unfortunately failed."
Record, pp. 575-78.
"Having considered the evidence and the arguments advanced, we find that the Petitioner should be allowed to recover over a 15-year amortization period $190,746,580 of its costs incurred in connection with the abandoned Bailly, N-1 project. Said costs should be amortized over a 15-year period commencing with the effective date of this Order. The related deferred income taxes of $69,096,517 should be amortized over 15 years also. The Commission further finds that Petitioner should file for the Commission's approval, at least 30 days prior to the end of said amortization period, new rate schedules which, effective the day after the end of said amortization period, reduce the Petitioner's rates then in effect in an amount equal to the annual revenues then required to provide for the annual amortization of the Bailly, N-1 costs allowed herein."
Record, pp. 489-90. Further of the Commission's findings and conclusions, as well as additional facts in the record and arguments of the parties, will be addressed as they become relevant to my dissent.

DECISION
Our standard of reviewing the Commission's actions is governed by statute. IND. CODE 8-1-3-1 states in pertinent portion:
"An assignment of errors that the decision, ruling or order of the commission is contrary to law shall be sufficient to present both the sufficiency of the facts found to sustain the decision, ruling or order, and the sufficiency of the evidence to sustain the finding of facts upon which it was rendered."
In practical terms, this provision requires that this court determines that (1) the Commission's ultimate conclusions are supported by specific findings on all basic facts material to such conclusions and that (2) "there is substantial evidence in light of the whole record to support the Commission's findings of basic fact." L.S. Ayres & Co. v. Indianapolis, Power & Light Co., (1976) 169 Ind. App. 652, 351 N.E.2d 814, 822; City of Evansville v. Southern Indiana Gas & Electric Co., (1975) 167 Ind. App. 472, 339 N.E.2d 562. Inasmuch as the Intervenors have asserted the Commission's order is contrary to law with regard to its treatment of the Bailly costs, this court must adhere to the aforementioned statute.
Among the additional considerations imperative to our review is the fact that the Commission performs a legislative, rather than judicial, function. Thus, we are restrained from substituting our own judgment for that of the Commission's when addressing the merits of their administrative decisions. Bethlehem Steel Corp. v. Northern Indiana Public Service Co., (1979) Ind. App., 397 N.E.2d 623. We presume its orders are valid unless the contrary is clearly apparent. Such presumption vanishes if the Commission fails to conform "to all relevant statutes, standards, and legal principles." Illinois-Indiana Cable Television Association, Inc. v. Public Service Commission, (1981) Ind. App., 427 N.E.2d 1100, 1105. In this instance, I believe the Commission has so failed to perform in its function of establishing just and reasonable rates for NIPSCO's ratepayers. See IND. CODE 8-1-2-4 (amended 1984 Ind. Acts, P.L. 59 § 10). After examining the first tier of review  a determination of whether the Commission's ultimate conclusions are supported by sufficient basic facts  I conclude the Commission's basic findings fail to support its $190 million charge to the ratepayers for the Bailly cancellation.
When the Commission operates within its jurisdiction for purposes of establishing the rates a public utility may charge its consumers, *953 its "primary objective ... is to establish a level of rates and charges sufficient to permit the utility to meet its operating expenses plus a return on investment which will compensate its investors." City of Evansville v. Southern Indiana Gas & Electric Co., supra, 167 Ind. App. at 478, 339 N.E.2d at 568; L.S. Ayres & Co. v. Indianapolis Power & Light Co., supra; I.C. 8-1-2-4. The immediate costs which must be covered by rates include every-day operating expenses (e.g., wages, fuel, maintenance, salaries), annual depreciation of utility plant in service, and operating taxes. The Commission then determines the utility's rate base, the amount of investment represented by "used and useful" utility property, upon which the utility's investors will earn a rate of return. L.S. Ayres & Co. v. Indianapolis Power & Light Co., supra; City of Evansville v. Southern Indiana Gas & Electric Co., supra. Thus, the consumer not only pays the daily service costs but also pays back the investors' capital through annual depreciation upon plant in service and a return upon that capital which remains in the rate base as used and useful property of the utility. This scheme constitutes the basic premise upon which a regulated public utility exists.
A public utility like NIPSCO serves a simple basic function  it provides the energy needs of the public, a service neither the individual nor the corporate consumer could generate of its own efforts. The utility, however, does not function without certain needs of its own. A utility must have capital and organization in order to exist at all, and these are typically supplied by investors from the private sector. In order to attract investors, a certain incentive must be offered. This incentive is provided by the consumers in the form of a return on the capital invested, see generally Re Boston Edison Co., (Mass.Dept.Pub. Util. 1982) 46 P.U.R. 4th 431, affirmed Attorney General v. Department of Pub. Utilities, (1983) 390 Mass. 208, 455 N.E.2d 414, which return takes the form of either interest upon investment in debt or dividends upon the payment for the use of the funds and for the assumption of any and all risks that the investment may be lost or diminished before it is returned. I. BARNES, THE ECONOMICS OF PUBLIC UTILITY REGULATION 517-18 (1942). In simple terms then, the investors  who supply what the public needs  expect to earn a reward for their efforts. In order to prevent the rampant abuses inherent in such a monopolistic system, the public acquires the right to set the prices a utility can charge for its services. This substitute for a competitive market is embodied in the state and federal regulatory commissions. Thus, the Commission is imbued with the statutory power to supervise and regulate the relationship between the state's "privately" owned utilities and the public. Public Service Commission v. Indiana Bell Telephone Co., (1955) 235 Ind. 1, 130 N.E.2d 467.
This balance between the two parties in interest is most clearly observed in the ratemaking process where the Commission is mandated to assess rates that are fair and reasonable to both the consumers and the utility in exchange for reasonably adequate service and facilities. See, e.g., Public Service Commission v. Indiana Bell Telephone Co., supra; I.C. 8-1-2-4. It is the tension between these two forces and the balance which must be attained that has been the focus of our review of this case. Therefore, the primary considerations here devolve to one basic question: Who must absorb the cost of the cancelled Bailly nuclear project?
The rates NIPSCO can charge for anything are governed by statute:
"Every public utility is required to furnish reasonably adequate service and facilities. The charge made by any public utility for any service rendered or to be rendered either directly or in connection therewith shall be reasonable and just, and every unjust or unreasonable charge for such service is prohibited and declared unlawful." (Emphasis added.)
I.C. 8-1-2-4. "Service"  the only thing for which ratepayers can be charged  is defined in IND. CODE 8-1-2-1 (amended 1984 Ind. Acts, P.L. 59 § 8), as follows:

*954 "The term `service' is used in this act in its broadest and most inclusive sense and includes not only the use or accommodation afforded consumers or patrons but also any product or commodity furnished by any public or other utility and the plant, equipment, apparatus, appliances, property and facility employed by any public or other utility in performing any service or in furnishing any product or commodity and devoted to the purposes in which such public or other utility is engaged and to the use and accommodation of the public." (Emphasis added.)
As parsed by this court in a recent decision, the statute delineates three kinds of service:
"(1) The use or accommodation afforded consumers or patrons;
(2) Any product or commodity furnished by the utility; or
(3) The plant, equipment, apparatus, appliances, property, and facility employed by the utility
(a) in performing any service, or
(b) in furnishing any product or commodity and devoted
(a) to the purposes in which such utility is engaged and
(b) to the use and accommodation of the public."
Illinois-Indiana Cable Television Association, Inc. v. Public Service Commission, supra, 427 N.E.2d at 1109. In the determination of whether the Bailly costs can be considered service, one must be guided in the interpretation of the words in I.C. 8-1-2-1 by the rule found in IND. CODE 1-1-4-1(1):
"Words and phrases shall be taken in their plain, or ordinary and usual, sense. But technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import."
See Foremost Life Insurance Co. v. Department of Insurance, (1980) 274 Ind. 181, 409 N.E.2d 1092. Applying this template to the statutory meaning of "service," I believe the Bailly costs fit within only one category.
In determining the Bailly costs are indeed a service, the parties must remember the exact nature of these expenditures. They are, quite simply, money spent on a project which was cancelled before fruition. Nothing tangible, other than an excavation with a few test piles, ever resulted from the venture, and this meager offering was certainly never an active asset to NIPSCO. Thus, Bailly was never plant, equipment, apparatus, appliances, property,[6] or facility employed in performing service or furnishing a product or commodity. Neither does Bailly fit within the second category of service because no product or commodity was ever produced, much less furnished to the consumers. I am left with one category of service within which to fit the Bailly costs: "use or accommodation afforded consumers or patrons." Obviously, Bailly was never used by consumers or patrons, thus excluding all but one service that Bailly could possibly fulfill  accommodation. Bailly fits exactly within this category.
"Accommodation," as it is ordinarily and usually employed, means "something that is supplied for convenience or to satisfy a need." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 12 (1976).[7] *955 In the tradition of the public utility business, it is NIPSCO's role, as supported by its investors, to seek out the most cost-efficient manner of producing energy. Indeed, it is NIPSCO's statutory duty to "furnish reasonably adequate service and facilities." I.C. 8-1-2-4. Thus, in deciding that NIPSCO's efforts were designed for and aimed toward this goal, I find it was accommodating its consumers, who are in no suitable position to do so on their own. In this respect, I believe NIPSCO's expenditures on Bailly analogous to research and development costs, which, although not necessarily actively utilized in operations, are a recoverable aspect of expenses. See, e.g., Southern California Edison Co. (Cal.Pub. Util.Comm'n 1982) 50 P.U.R. 4th 317; Southern California Edison Co. (Fed. Power Comm'n 1977), 23 P.U.R. 4th 44. This is "accommodation" in its "broadest and most inclusive sense," and I believe this to be the only fitting definition of "service" available to the Commission in labelling the Bailly costs. (Accommodation also need not be useable by consumers inasmuch as the legislature provided for that category when it drafted the phrase "use or accommodation afforded.") See also Illinois-Indiana Cable Television Association, Inc. v. Public Service Commission, supra, 427 N.E.2d 1100 (accommodation for utility).
Here, the Commission is bound by the clear terms of the statute regardless of its expertise in other regulatory matters. See, e.g., Illinois-Indiana Cable Television Association, Inc. v. Public Service Commission, supra, 427 N.E.2d 1100 (jurisdiction of Commission limited by statute); cf. Office of Consumers' Counselor v. Public Utilities Commission, (1981) 67 Ohio St.2d 153, 423 N.E.2d 820 (statutory parameters for fixing rates prevented the amortization of any costs associated with four cancelled nuclear plants). And requiring the consumers to pay for this service associated with Bailly achieves the balance sought in utility regulation, as discussed previously. The capital the consumers require in order to meet their direct and indirect energy needs can only be supplied on a grand scale and, thus, from investors. That the consumers should in turn pay the capital back seems only fair and is a decision in accordance with the treatment by the majority of the jurisdictions faced with similar cancellations. See Nepco Municipal Rate Committee v. Federal Energy Regulatory Commission, (D.C. Cir.1981) 668 F.2d 1327, cert. denied New England Power Co. v. Federal Energy Regulatory Commission, (1982) 457 U.S. 1117, 102 S.Ct. 2928, 73 L.Ed.2d 1329; Union Electric Co. v. Federal Energy Regulatory Commission, (8th Cir.1981) 668 F.2d 389; San Diego Gas & Electric Co. (Cal.Pub.Util.Comm'n 1979) 31 P.U.R. 4th 435; Re Central Illinois Light Co., (Ill.Commerce Comm'n 1983) 57 P.U.R. 4th 351; Re Boston Edison Co., supra, 46 P.U.R. 4th 431; Re Detroit Edison Co., (Mich.Pub.Serv.Comm'n 1983) 52 P.U.R. 4th 318; Atlantic City Electric Co., (N.J. Bd.Pub.Util. 1983) 51 P.U.R. 4th 109; Re Rochester Gas & Electric Corp., (N.Y.Pub. Serv.Comm'n 1982) 45 P.U.R. 4th 386; Duke Power Co., (N.C.Util.Comm'n 1982) 49 P.U.R. 4th 483, mod. (1983) 51 P.U.R. 4th 141; Central Vermont Public Service Corp. (Vt.Pub.Serv.Bd. 1982) 49 P.U.R. 4th 372; contra, Arizona Public Service Co., (Ariz.Corp.Comm'n 1980) 38 P.U.R. 4th 547; Re Union Electric Co., (Mo.Pub.Serv. Comm'n 1983) 57 P.U.R.4th 169; Office of Consumers' Counselor v. Public Utilities Commission, supra, 67 Ohio St.2d 153, 423 N.E.2d 820; Pacific Power & Light Co. v. Public Service Commission, (1984) Wyo., 677 P.2d 799. Although some of the authority allowing the amortization of costs of cancelled projects attribute their decision to a just allocation of the risks inhering in new ventures, see, e.g., Union Electric Co. v. Federal Energy Regulatory Commission, supra, 668 F.2d 389, I believe the better approach is to charge consumers only what is statutorily permitted. *956 Such strikes the balance of utility regulation itself. Risks of new ventures should only be borne by investors  they are calculated in their rate of return.[8]
Assuming for the moment that the Bailly project was a prudent and therefore a recoverable service when conceived and executed, I find a grave error in the Commission's order  the imposition upon the consumers of payment for the over $69 million attributed to "allowance for funds used during construction" (AFUDC). This "paper" expenditure is clearly not allowable under Indiana law.
AFUDC is frequently referred to as the cost of using investors' capital. Capital Improvement Board v. Public Service Commission, (1978) 176 Ind. App. 240, 375 N.E.2d 616. In practical terms, it is the return earned by capital while it is used for construction. "The theory behind this charge is that during the construction period the capital involved is earning no return, although it has to be paid for, and that its cost or `hire' is therefore a true part of the cost of constructing the facilities." B. GRAHAM, D. DODD, & S. COTTLE, SECURITY ANALYSIS 294 (1962) (defining AFUDC's prior label, "interest charged to construction"). For purposes of the Bailly costs, the AFUDC is not an amount of money actually spent. Rather, it is the running tabulation of the return on capital used in the project, which would have been capitalized as a cost of plant if it had been finished and added to the rate base. After being added to a rate base, "the accrued AFUDC is gradually recovered from ratepayers through depreciation charges over the life of the project. In the meantime, the undepreciated balances earn a rate of return." Bruder, Recovery of Losses on Cancelled Projects: Basic Issues in ELECTRIC POWER: CURRENT ISSUES IN REGULATION & FINANCING 167, 177 (1982); see, e.g., Capital Improvement Board v. Public Service Commission, supra. Thus, the practical regulatory terminology for this "cost of capital" is more appropriately denominated a "return." See also Office of Consumers' Counselor v. Public Utilities Commission, (1983) 6 Ohio St.3d 377, 453 N.E.2d 673 ("interest charges on borrowed funds and the cost of equity funds"). Under Indiana law, investors are not allowed to earn a return on the Bailly costs.
As I explained before  and as I reiterate here  investors may only earn a return as a percentage of a rate base comprised of "used and useful" property. IND. CODE 8-1-2-6; e.g., Office of Utility Consumer Counselor v. Public Service Co. of Indiana, Inc., (1984) Ind. App., 463 N.E.2d 499; Bethlehem Steel Corp. v. Northern Indiana Public Service Co., supra, 397 N.E.2d 623. In other words, the ratepayers pay for a "use" service on a rate base when they pay a return. There is no question the Bailly project is not used and useful. Thus, I am not discussing here AFUDC which has accrued during construction and is later returned as a part of the rate base when a project goes into service. Instead, we have an accrued return that can never attach to used and useful property. Under the circumstances, no return can be allowed here; hence, the consumers cannot be charged the AFUDC.
The Commission's order recognizes this principle to the extent that it acknowledges NIPSCO cannot earn a rate of return on the unamortized portion of the Bailly costs. But the Commission stopped short and would allow the ratepayers to pay a return on the costs anyway in the form of AFUDC. This determination was contrary to law.
I am aware of authority NIPSCO has cited for the proposition that AFUDC may be collected. See, e.g., Northern States Power Co., (Fed.Energy Regulatory Comm'n 1981) 46 P.U.R. 4th 110; Re Central Illinois Light Co. supra 57 P.U.R. 4th 351; State ex rel. Utilities Commission v. Conservation Council of North Carolina, *957 (1983) 64 N.C. App. 266, 307 S.E.2d 375. However, I believe the wiser course, and the only one allowed by Indiana law, is that followed in other cases where AFUDC is disallowed. E.g., San Diego Gas & Electric Co., supra, 31 P.U.R. 4th 435; Bangor Hydro-Electric Co., (Me.Pub.Util.Comm'n 1982) 46 P.U.R. 4th 503; Central Maine Power Co. v. Public Utilities Commission, (1981) Me., 433 A.2d 331; Re Boston Edison Co., supra, 46 P.U.R. 4th 431; Virginia Electric & Power Co., (Va.State Corp. Comm'n 1979) 29 P.U.R. 4th 65.[9]
In contradiction to this conclusion, NIPSCO argues the efficacy of amortizing the entire cost of Bailly because the Commission is disallowing rate-base treatment of the unamortized costs and rationalizes the investors will only get a return of their investment but no return on their investment.[10] This is a familiar argument found in some of the cases I have reviewed. See, e.g., Union Electric Co. v. Federal Energy Regulatory Commission, supra, 668 F.2d 389. If the full effect of this principle is properly extended, however, AFUDC should also be disallowed as it too is a return on investment. The logic of doing otherwise escapes me.
To this end, I also decline to distinguish between AFUDC for debt and AFUDC for equity and disallow both. But see Re Commonwealth Electric Co., (Mass.Dept. Pub.Util. 1982), 47 P.U.R. 4th 229; Carolina Power & Light Co., (N.C.Util.Comm'n 1982) 49 P.U.R. 4th 188. To do otherwise would, I believe, create a distinction without a difference. I recognize that NIPSCO is legally obligated to pay the debt AFUDC as interest to its mortgage and bondholders. However, this obligation may not be imposed on the consumers because, as have explained, Bailly was never used and useful property. Although it might appear inequitable for this burden to fall on the common shareholders, I must keep in mind that one of the risks that shareholders bear in so investing is that their "right to income is contingent upon prior payments to bondholders and preferred stockholders and [that their] capital contribution constitutes a cushion protecting the senior securities from an impairment of their investment." I. BARNES, THE ECONOMICS OF PUBLIC UTILITY REGULATION at 518. The incentive to invest in this manner, of course, stems from the fact that shareholders receive a return on a regular basis in the form of dividends based upon a percentage of the rate base. Simply because the Bailly project will never earn a return does not mean the shareholders are denied dividends  they regularly collect dividends on the used and useful rate base. They therefore must bear the risks associated with this form of return (which could prove more lucrative than the returns on debt investment as fixed by the interest rates on the bonds and mortgages). All AFUDC must be disallowed, without distinction.
The upshot of my opinion then, as it applies to the Commission, is that its order is contrary to law. The basic facts fail to support the ultimate conclusion that the ratepayers must pay over $190 million for the Bailly costs. AFUDC was part of that *958 bill, and its inclusion was improper. Over $69 million must be disallowed.[11]
Progressing to the second tier of review, whether there is substantial evidence to support the Commission's basic findings, I find the order to be partially in error in this respect also. I would adjudicate that ratepayers must absorb Bailly costs as a service supplied by NIPSCO in accommodation to the consumers' desire for efficient and inexpensive energy. However, after reviewing the record, I find that certain portions of costs attributable to this accommodation service must be disallowed. There is insufficient evidence to determine otherwise.
Preliminarily, I feel compelled to explain briefly what the second tier of review entails. This court must determine from the record whether there was substantial evidence before the Commission to justify its basic findings. There must be more than a scintilla of evidence available, meaning that we must decide whether the Commission could have reasonably made their findings based on the evidence of record. See L.S. Ayres & Co. v. Indianapolis Power & Light Co. supra, 351 N.E.2d 814; City of Evansville v. Southern Indiana Gas & Electric Co., supra, 339 N.E.2d 562. A careful review of the record and of the burdens of the parties in presenting and opposing the rate increase reveals the Commission lacked just such substantial evidence on a crucial issue involving certain discrete portions of the Bailly costs. This crucial issue pertains to the prudence of NIPSCO's management in (1) not abandoning the project as of August, 1980, and (2) permitting the expenditure of possibly excessive engineering costs while the project was in limbo.[12]
I clearly follow a majority position when I adhere to the principle that only prudently made expenses for this accommodation service are chargeable to NIPSCO's consumers. See, e.g., Federal Power Commission v. Hope Natural Gas Co., (1944) 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333; West Ohio Gas Co. v. Public Utilities Commission, (1935) 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761; San Diego Gas & Electric Co., supra, 31 P.U.R. 4th 435; Office of Utility Consumer Counselor v. Public Service Co. of Indiana, Inc., supra, 463 N.E.2d 499; Re Detroit Edison Co., supra, 52 P.U.R. 4th 318. The measure of the prudence of utility expenditures is gauged by what one would consider good management decisions and practices. I realize
"`[t]he commission is not the financial manager of the corporation and it is not empowered to substitute its judgment for that of the directors of the corporation; nor can it ignore items charged by the utility as operating expenses [in this case, accommodation service], unless there is an abuse of discretion in that regard by the corporate officers.'"
Columbus Gaslight Co. v. Public Service Commission, (1923) 193 Ind. 399, 404, 140 N.E. 538, 540. However, the Commission *959 can and must eliminate from a rate case all expenses imprudently made. This function is part of the Commission's role in regulating a utility's operations by providing a competitive factor the consumers are unable to employ.
In order to so function, the Commission is allowed to presume a utility's costs are prudently incurred. See Anaheim v. Federal Energy Regulatory Commission, (D.C. Cir.1981) 669 F.2d 799; Union Electric Co. v. Federal Energy Regulatory Commission, supra, 668 F.2d 389. "`However, where some other participant in the proceeding creates a serious doubt as to the prudence of an expenditure, then the [utility] has the burden of dispelling these doubts and proving the questioned expenditures to have been prudent.'" Anaheim v. Federal Energy Regulatory Commission, supra, 669 F.2d at 809; Minneapolis Street Railway Co. v. City of Minneapolis, (1957) 251 Minn. 43, 86 N.W.2d 657; contra, Southern California Edison Co., supra, 50 P.U.R. 4th 317 (company must initially demonstrate prudence of a cancelled project). I have found evidence presented by the Intervenors raises a serious doubt with regard to certain of NIPSCO's expenditures. NIPSCO has not countered with substantial evidence to carry its burden of proof (IND. CODE 8-1-2-73) (amended 1984 Ind. Acts, P.L. 59 § 32), and I believe the Commission's order partially in error.
The Commission's only findings in this matter are:
"We find that [NIPSCO] prudently began construction of Bailly, N-1... . The Bailly, N-1 project was a reasonable undertaking by [NIPSCO] to meet its duty to serve."
No one apparently disputes the correctness of NIPSCO's initial decision to construct a nuclear generating station as a means of meeting its service needs. The forecasting of the late 1960's and early 1970's indicated a steadily increasing demand for electricity. Other utilities had been experiencing success with nuclear plants, and with the rapidly rising costs of fossil fuels, nuclear energy appeared to be the most economical source of energy. Despite the higher capital costs involved in constructing a nuclear plant as compared to those of a coal-fired plant, the lower cost of nuclear fuel would have made Bailly's operating costs only 2.75 mills per kwh as opposed to 5.26 mills per kwh for a coal plant. On the basis of this evidence, I believe NIPSCO prudently initiated the Bailly project. However, the Intervenors challenged NIPSCO's failure to cancel the project earlier than it did in 1981. NIPSCO, other than uttering self-serving statements that its management made prudent decisions, has not offered substantial evidence to rebut the Intervenors' evidence in this regard nor the unfavorable evidence it brought forward on its own behalf.
The Intervenors' expert, Dr. Viren, basically testified that the Bailly project should have been cancelled in 1980, based upon the interaction of NIPSCO's inadequate forecasting of electrical load growth, an increase in regulatory delay, and upon an inaccurate comparison of coal- and nuclear-plant costs. Both sides on this case made cogent arguments and presented facts on the forecasting problem and the cost comparison. As I believe these two issues are better left to the Commission's expertise in this instance, I do not question its conclusions on these matters. However, I believe Viren raised a legitimate, and largely unanswered, doubt regarding NIPSCO's prediction of the length of regulatory delay it would suffer.
The primary focus of NIPSCO's continuation of the Bailly project was that so long as the facility could be completed in 1989, its costs and operating expenses would still be economically more favorable than comparable coal-fired sources. Thus, whenever NIPSCO could ascertain the 1989 date was unattainable, the project would have to be scrapped. NIPSCO reached this point in August, 1981. A more realistic assessment should have halted it no later than August, 1980. In making this decision, I do not view the problem from the benefit of hindsight but from the facts NIPSCO had before *960 it no later than August, 1980  in other words, the facts it had before it in 1980 were essentially no different than in 1981 and would have indicated to NIPSCO that its problems would not resolve themselves in the immediate future.
A brief summary of how NIPSCO handled early regulatory and litigation delay may be helpful: NIPSCO applied for its first construction permit in August, 1970, and did not receive it until almost four years later, May, 1974. (This exceeded NIPSCO's expected projection by four months.) From October, 1974, until November, 1976, the permit issue made its way through the federal court system. In 1977, the NRC suspended NIPSCO's construction because of problems with the pile placement for the facility's foundation. In February, 1979, NIPSCO filed for an extension of its construction permit. In March, 1979, the incident at the Three-Mile Island facility occurred. In August, 1980, the NRC issued its final orders on hearings concerning the permit extension and allowed certain petitioners to take part, and the Porter County Board of Zoning Appeals ruled NIPSCO would have to obtain a special zoning exception during later construction. During all this time, only fifteen months of actual construction took place  four months in 1974 until stayed by the federal court, eight months in 1977 until the NRC halted work, and three months in 1978 when test piles were driven. We therefore perceive a distinct pattern of delay in construction caused by litigation involving various public and private entities (local chapter of Izaak Walton League, Concerned Citizens Against the Bailly Nuclear Site, Businessmen for the Public Interest, Bethlehem Steel Corp., State of Illinois, City of Gary), by NRC orders and its lengthy proceedings, and by voluntary cessation during litigation. NIPSCO, despite these problems, underestimated the delay probable before the construction would be complete.
NIPSCO's petition for a construction permit extension in 1979, estimated a 98-month total construction period. Imbedded in this time-frame was a 15-month allowance for uncertainties, with no construction. By November, 1980, the construction period was extended by another 9 months, with three months of that added to the uncertainty category. At this point, NIPSCO revised its 1987 completion date to 1989, with a start-up date for resuming construction projected for January, 1981. The facts lead me to believe NIPSCO should have realized the 1989 date was improbable much sooner than August, 1981.
I am led to this conclusion by NIPSCO's unrealistic assessment that it needed to only foretell uncertain factors to the extent of fifteen months (extended to eighteen months in November, 1980). The facts recited above relating to the delay of Bailly up to August, 1980, reveal a concerted litigious effort to prevent the completion of Bailly, particularly by public interest groups. Construction was halted by court order for almost a year and a half, and NIPSCO voluntarily refused to construct for another six months while the Seventh Circuit decision was before the Supreme Court on certiorari. By June, 1980, some of these same parties, still quite active in pursuit of their goal, were again seeking the suspension or revocation of NIPSCO's permit. An added concern in their request was whether the local populace could be timely evacuated in the event of a nuclear accident, obvious progeny of the Three-Mile Island affair. These groups had already held up construction for 18 months by court-ordered stay in the earlier years of the project. An additional six months' delay was voluntarily incurred during certiorari, an action NIPSCO adamantly claims was a prudent management decision.
The logical conclusion to this scenario should have been that the public interest groups were going to continue their efforts without abatement before the NRC and the federal courts. Add to this, the legal entanglements in a zoning case during the construction, and we cannot help but feel assured that a 15-month (or even an 18-month) uncertainty period during construction was imprudently optimistic. And with the national exposure of Three-Mile Island, *961 how long did NIPSCO think it could avoid confronting larger and much more formidable national groups?[13] The Department of Interior had already involved itself. I also remind NIPSCO that its management took a very conservative attitude by not constructing during litigation, even when there was no stay. This decision was evidently executed for the purpose of saving costs, but if NIPSCO would like for this court to deem this past practice a prudent management decision, I do not think it could now argue it would have done the contrary in the future and still be prudent. As a result of the foregoing, I believe that at the very least, NIPSCO's meager 15-month assessment for uncertainty in effect in August, 1980, was unrealistic based solely on its prior litigation problems.
The other major consideration adding to an uncertainty factor was the notable NRC regulatory delay NIPSCO had already had and should have foreseen before August, 1981. In 1977, the NRC suspended construction because of concerns over the foundational piles. NIPSCO promptly notified the NRC of adjustments to the pile issue in order to avoid delay and further costs. NRC requested a test program, and NIPSCO had complied by December, 1978. In August, 1980, this issue was still not resolved despite the fact that NIPSCO was assured no hearings would be held (and were in fact not held). This span of time was of itself over 18 months long to be added to the 15-month period of suspension from September, 1977, until the pile testing was completed in December, 1978. Concurrently, NIPSCO applied for an extension to its construction permit in February, 1979. Eighteen months passed before NIPSCO even received the final order for holding hearings, in August, 1980. I realize this interim period was lengthened by the NRC's attention to the Three-Mile Island facility. However, I am also aware that the NRC reaction to Three-Mile Island was to lengthen the regulatory review process. Not only did the NRC, in November, 1979, suspend the automatic effectiveness of its decisions with respect to amending construction permits (10 C.F.R. § 2.764() suspended in 44 Fed.Reg. 65049),[14] but NIPSCO admitted that design changes as a result of the accident would have to be made. If the change in pile designs caused a furor among Bailly's opposition and translated into NRC proceedings, the same would in all likelihood occur for other changes. Compound my earlier conclusions regarding NIPSCO's litigation problems, with the reasonable and foreseeable regulatory delays, and I believe that by August 31, 1980, at the very latest, NIPSCO should have known Bailly N-1 could not be completed by 1989.
NIPSCO argues on a related issue, that regardless of regulatory delay, it could still construct while the permit extension was being resolved by the NRC. Such argument is not in line with the facts nor responsive to the issue. The NRC itself had halted construction once, a court-ordered stay had suspended excavation another time, and NIPSCO itself had voluntarily chosen not to build during litigation. Not only can NIPSCO not assure this court it has any control over whether it could go forward with construction, it had demonstrated it would not so continue until all official proceedings were concluded. NIPSCO would have us believe that, although the first six years of its permit resulted in only 15 months of construction, its last eight years of activity would produce no less than 74 months' worth. My opinion reflects a justified skepticism toward such a conclusion.
I am aware of a report made by the NRC staff in July 17, 1981, that NIPSCO's estimated time of completion in 1989, was reasonable. Record, p. 887 et seq. The staff examined the progress of comparable reactors *962 being built and already completed. I do not dispute NIPSCO's schedule appeared reasonable when viewed in this manner, but "reasonableness" does not equate with "realistic." The parameters of the study related the individual and severe problems NIPSCO had already experienced but failed to take them into account when discussing the length of extension of the construction permit. All the facilities compared to Bailly in the study had received construction permits between October, 1972, and June, 1974. Five of the plants would actually be complete by September, 1983. Bailly, on the other hand, was the only one shown to have not even begun significant construction! The reason for the difference, of course, is well documented in the facts above. Any hopes that these problems would dissipate and make the Bailly project actually comparable to the NRC staff's selections would be misdirected. The differences are simply much too dramatic for us to ignore, and thus, I believe the NRC staff report a reasonable study but of insignificant practicality in the face of NIPSCO's particular problems.
My ultimate conclusion is that by August, 1980, after finally receiving the final order that hearings would be set for the permit extension and after the Porter County Board of Zoning Appeals ruled NIPSCO would have to apply for exceptions later, NIPSCO's management imprudently continued the project. The Commission's order was therefore incorrect in its assessment NIPSCO had acted prudently with regard to the Bailly project. The Intervenors raised a serious doubt as to this issue, and I can find no more than a scintilla of evidence  a post hoc finding of reasonableness by the NRC staff report  to rebut that doubt. The Commission must therefore disallow the amount attributable to the period between August 31, 1980 and August 26, 1981, roughly $17 million less applicable salvage and AFUDC already subtracted. See Re Boston Edison Co., supra, 46 P.U.R. 4th 431 (unacceptable level of risk made utility's decision to continue project after June, 1980, imprudent).
The Intervenors raised another issue with regard to the prudence of the cost of engineering services on the project, particularly after 1977. My review of NIPSCO's securities prospectuses reinforces that doubt. Up to January, 1977, total engineering services had cost $10.2 million. During a period of construction from January, 1977 through August 31, 1977, just prior to when the NRC suspended operations, NIPSCO had expended an additional $2.1 million. However, from September, 1977, until March, 1980, when the only construction activity had been the test program, $21.5 million are registered as costs of engineering. I do not necessarily question whether NIPSCO should have anticipated various regulatory delays to the point of totally dismantling engineering staffs only to have to remobilize them. What I am concerned about is that the cost for engineering when there was no construction was almost 2.5 times the amount spent when there was ($2.1 million for 8 months compared to $21.5 million for 30 months). Again, the Intervenors have raised the factual doubt; NIPSCO has failed to rebut it. However, there is no evidence of the allocations and justifications for the engineering expenses. I would not so disadvantage NIPSCO and wildly conjecture what would be an appropriate adjustment. Therefore, NIPSCO would be allowed to present factual evidence justifying these engineering costs, and I would leave the ultimate decision of prudence to the better-equipped Commission.[15]
I realize that this opinion does not wholly address the arguments made by NIPSCO that a loss of capital by investors will make it increasingly difficult, and consequently more expensive, to obtain financing for later construction. Economists presented theories in this case going either way, arguing back and forth the risks and costs that should be borne by shareholders and by ratepayers. I agree with NIPSCO the *963 financial integrity of a utility is important to both factions, but the fact of the matter is that economists' opinions with regard to the impact of this particular decision on the financial market is largely irrelevant. Economic projections are vital in establishing a rate of return suitable for attracting investment funds, but in terms of all other service charges, the court can only make consumers pay what the statute allows. Any changes in our statute, which I believe reasonably reflects regulatory policy, that consumers pay for service and shareholders bear the risks of investment, is the legislature's responsibility. Likewise untenable is NIPSCO's declaration that disallowance of Bailly costs will necessitate an increase in returns in later rate cases to reflect the risk of the cancellation. Now that the Bailly project is cancelled, the risk is gone. NIPSCO should have asked for those higher rates when the risk was present; an ex post facto assessment would be outside regulatory policy. I do not deny the costs of future financing may well increase, but basing a decision on this factor would be engaging in pure speculation based upon the whims of present and potential investors. This court is confined to the law, and I would base our decision based thereon, and reverse in part and remand.[16]
NOTES
[1] I additionally note an unwarranted intermingling of the terms "abandoned" and "cancelled," "abandoned" projects being nearly universally recoverable as once having been used or useful property. See, e.g., Washington Gas Light Co. v. Baker (D.C. Cir.1950), 188 F.2d 11 cert. denied (1951) 340 U.S. 952, 71 S.Ct. 571, 95 L.Ed. 686; Valparaiso Lighting Co. v. Public Service Comm'n (1921), 190 Ind. 253, 129 N.E. 13; Minneapolis Street Railway Co. v. City of Minneapolis (1957), 251 Minn. 43, 86 N.W.2d 657. The majority's interpretation of the "test year" also conflicts with City of Evansville v. Southern Indiana Gas & Electric Co. (1974), 167 Ind. App. 472, 339 N.E.2d 562, where the data gathered in any one test year may be subjected to "in-period" or "out-of-period" adjustments if the historical year chosen is not, or will not be, reflective of normal operations.
[2] The City of Fort Wayne had also joined in the assignment of errors filed in this court, but NIPSCO successfully moved for its dismissal from the action on the grounds it had never properly intervened in the Commission's proceeding.
[3] Porter County Chapter of Izaak Walton League of America, Inc.; Concerned Citizens Against the Bailly Nuclear Site; Businessmen for the Public Interest, Inc.; Bethlehem Steel Corp.; and four private citizens.
[4] The passage of this litigation can be found in Porter County Chapter of Izaak Walton League v. Atomic Energy Commission, (7th Cir.) 515 F.2d 513, rev'd Northern Indiana Public Service Co. v. Porter County Chapter of Izaak Walton League of America, Inc., (1975) 423 U.S. 12, 96 S.Ct. 172, 46 L.Ed.2d 156, and Porter County Chapter of Izaak Walton League v. Atomic Energy Commission, (7th Cir.) 533 F.2d 1011, cert. denied (1976) 429 U.S. 945, 97 S.Ct. 366, 50 L.Ed.2d 316.
[5] I have been able to find evidence regarding only one of those orders, Cause No. 32079, in the record before us. The testimony revealed the Lake-of-the-Woods gas storage facility (Cause No. 32079) is not apropos to the problem here. Testimony revealed it was actually in service until leakage problems were discovered. This was an abandoned facility not a cancelled project. Different policy considerations apply, and 18 C.F.R. Part 101, Account 182 (1983) clearly takes those different factors into account by particularly providing for losses associated with "property abandoned or otherwise retired." (Emphasis added.) Cancelled projects are not so considered.
[6] Because my conclusion denies the Bailly expense the characterization of "property," as it was never active in NIPSCO's operations, NIPSCO's arguments concerning its treatment as an extraordinary property loss in accordance with 18 C.F.R. Part 101, Account 182, are irrelevant.
[7] I am aware that "accommodation" has a specialized legal meaning, "[a]n arrangement or engagement made as a favor to another, not upon a consideration received." BLACK'S LAW DICTIONARY 32 (1968). However, I find the ordinary lay meaning apposite to our statutory construction for two reasons. First, the legal meaning is typically employed in practices surrounding commercial paper. See, e.g., IND. CODE 26-1-3-415; White v. Household Finance Corp. (1973) 158 Ind. App. 394, 302 N.E.2d 828. Second, the clear import of the statutory regulation of utilities is that they will be paid for services labelled "accommodation." This purpose would be directly in conflict with a legal definition which presumes no consideration is forthcoming. Such construction would plainly fly in the face of the clearly exhorted principle that, when construing a statute, we must "`give effect to the legislative intent.'" Dept. of State Revenue v. Crown Development (1952), 231 Ind. 449, 109 N.E.2d 426, 428-29, n. 1.
[8] My conclusion naturally takes no account of NIPSCO's argument that the delays in pursuing its project were not its fault. This is no reason to foist the costs on the ratepayers  it was not their fault either.
[9] In San Diego Gas & Electric Co., (Cal.Pub.Util. Comm'n 1979) 31 P.U.R. 4th 435, the California regulatory commission refused to charge ratepayers the accumulated AFUDC of a cancelled project because to do so would unduly burden them with the risks of construction with little or no risk on the shareholders. In addition, the commission opined such practice would provide little or no incentive for the utility to govern its expenditures on highly speculative projects. To the same effect was the Massachusetts commission's decision to disallow equity AFUDC in Re Boston Edison Co., (Mass.Dept.Pub.Util. 1982) 46 P.U.R. 4th 431. On the other hand, the Virginia commission disallowed AFUDC because it would not allow a return to be earned on expenditures for a cancelled project even though they were reasonably and prudently incurred. Virginia Electric & Power Co., (Va.State Corp. Comm'n 1979) 29 P.U.R. 4th 65.
[10] In accepting the Commission's conclusion that NIPSCO could recover all its Bailly costs but could not earn rate base treatment of unamortized portions, NIPSCO implies it is giving up funds to which it is entitled. The Commission clearly quashed such implication: "[NIPSCO] cannot be credited for `giving up' that which it cannot legally obtain."
[11] I also note that in "Electric Plant Instructions" in the Uniform System of Accounts, upon which NIPSCO so heavily relies for inclusion of the Bailly costs, subsection (17) of Components of Construction Cost states the following: "No allowance for funds used during construction charges shall be included in these accounts upon expenditures for construction projects which have been abandoned." 18 C.F.R. Part 101 (1983) (Emphasis added.)
[12] NIPSCO argues that the Intervenors have waived consideration of the prudence issue because they conceded, in their appellate brief, to the Commission's findings that NIPSCO acted prudently with regard to the Bailly project. I agree the Intervenors failed to adequately argue the issue, but I found no such concession. Nor do I consider the issue as having been waived. The Intervenors clearly called upon us to consider the second tier of review, the sufficiency of the evidence supporting the Commission's basic findings, when they alleged the rate order was contrary to law. See IND. CODE 8-1-3-1. We are also empowered to use our independent judgment in reviewing both the law and the facts when an issue is attacked in a rate decision. See Public Service Commission v. Indiana Bell Telephone Co. (1955) 235 Ind. 1, 130 N.E.2d 467 (rates are attacked as confiscatory thus court makes independent review of law and facts to protect constitutional rights). The Bailly issue was properly challenged, and we are authorized to review the sufficiency of the evidence to support the Commission's findings on the issue.
[13] By the fall of 1980, NIPSCO had a vast array of powerful organizations aligned against it: National Audubon Society, National Wildlife Federation, Sierra Club Legal Defense Fund, Izaak Walton League of America, Natural Resources Defense Council, National Parks and Conservation Association.
[14] 10 C.F.R. § 2.764 has since been revised. See 48 Fed.Reg. 52286.
[15] The Commission should also take into account the Intervenors' concession that most of the engineering services associated with quality control may have been valid.
[16] I would additionally authorize the Commission to consider shortening the 15-year amortization period but to no shorter a period than will reflect a 1-1.5% impact on the normal rates. See Bruder, Recovery of Losses on Cancelled Projects: Basic Issues in ELECTRIC POWER: CURRENT ISSUES IN REGULATION AND FINANCING 167, 176 (1982). NIPSCO will also have to make appropriate adjustments in its deferred tax calculations; ratepayers should not pay that portion of deferred taxes attributable to imprudently expended monies. In particular, if taxes have already been accumulated in reserve (Record, p. 1775) for this purpose, the portion of those funds attributable to imprudent costs should be applied to the ratepayers' burden of paying for the prudent costs. I believe tax adjustments would also have to be made with regard to the disallowed AFUDC. Again, I would defer to the Commission for a consideration of this problem and a determination of the amounts involved although maintaining the appealability of the issue as to the Commission's proper application of the pertinent laws.